CITY OF BOSTON *vs.* MASSACHUSETTS PORT AUTHORITY·
& others.

Suffolk.    November 6, 1973. — Februrary 27, 1974.

Present:  TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Equity Jurisdiction,* Damage to the environment. *Environmental Affairs. Administrative Agency. Regulation. Statute,* Construction, Effective date. *Massachusetts Port Authority. Administrative Matter. Jurisdiction,* Judicial review of administrative action. *Words,* "Damage to the environment," "Adjudicatory," "Regulatory."

A bill in equity by the city of Boston against the Massachusetts Port Authority seeking to enjoin construction of a terminal and garage at the Logan Airport was sufficient to invoke the jurisdiction of the Superior Court under G. L. c. 214, § 10A, although the only allegations of violations by the Authority related to failure of the Authority to submit plans of the garage to the Department of Public Health as required by a regulation of the Department and to failure of the Authority to comply adequately with G. L. c. 30, § 61. [644-647]

Air pollution control regulations adopted by the Department of Public Health are adopted pursuant to G. L. c. 111, §§ 142A and 142B [648-652]; and under § 142E are applicable to the Massachusetts Port Authority despite § 2 of the Authority's enabling act, St. 1956, c. 465, providing that the Authority "shall not be subject to the . . . regulation . . . of any department . . . of the commonwealth except to the extent and manner provided in this act" [653-658].

In a suit against the Massachusetts Port Authority involving the issue of
compliance by it with G. L. c. 30, § 61, with respect to proposed
building construction at the Logan Airport, a resolution which was
adopted by the Authority prior to the effective date of § 62 and which
merely paraphrased the language of § 61 and stated the Authority's
determination that "substantially no adverse effect on the environ-
ment" would result from the construction was held in the cir-
cumstances to be conclusive on its face of adequate compliance by the
Authority with § 61 and to preclude further inquiry into that matter.
[658-665]

BILL IN EQUITY filed in the Superior Court on April 13,
1973.

The suit was head by *Adams,* J.

*Herbert P. Gleason,* Corporation Counsel (*Peter Koff,*
Assistant Corporation Counsel, with him) for the city of
Boston.

*David C. Hawkins* (*John M. Reed* with him) for Vappi &
Company, Inc.

*Joseph L. Cotter* for South Terminal Corporation &
others.

*John M. Harrington, Jr.* (*John Silas Hopkins, III, &
Robert P. Nash* of Illinois, with him) for Massachusetts Port
Authority & others.

*Thomas B. Arnold* for the Sierra Club, *Harley F. Laing,*
Special Assistant Attorney General, for the Executive Office
for Environmental Affairs, & *Robert L. Thompson,* Assist-
ant Regional Counsel for the Environmental Protection
Agency, Region I, submitted briefs as amici curiae.

TAURO, C.J. The city of Boston filed a bill in equity in the
Superior Court pursuant to G. L. c. 231A and c. 214, § 10A,[1]

---

[1]The relevant provisions of § 10A are:

"As used in this section, 'damage to the environment' shall mean any destruction,
damage or impairment, actual or probable, to any of the natural resources of the
commonwealth, whether caused by the respondent alone or by the respondent and
others acting jointly or severally. Damage to the environment shall include, but not
be limited to, air pollution, water pollution, improper sewage disposal, pesticide
pollution, excessive noise, improper operation of dumping grounds, impairment
and eutrophication of rivers, streams, flood plains, lakes, ponds or other water
resources, destruction of seashores, dunes, wetlands, open spaces, natural areas,
parks or historic districts or sites. Damage to the environment shall not include any
insignificant destruction, damage or impairment to such natural resources.

"As used in this section 'person' shall mean any individual, association, partner-

to enjoin the construction by the defendant Massachusetts Port Authority (Authority) of a major new passenger terminal and automobile parking garage at the General Edward Lawrence Logan International Airport (Logan Airport). The plaintiff requested, in addition to injunctive relief, a declaration that the Authority,[2] in planning for, approving, and contracting for the construction of the terminal and garage, had failed to comply with certain air pollution control regulations adopted by the Department of Public Health (Department) pursuant to G. L. c. 111, §§ 142A-142E,[3] and also with certain requirements of G. L.

ship, corporation, company, business organization, trust, estate, the commonwealth or any political subdivision thereof, any administrative agency, public or quasi-public corporation or body, or any other legal entity or its legal representatives, agents or assigns.

"The superior court for the county in which damage to the environment is occurring or is about to occur may, upon the petition of not less than ten persons domiciled within the commonwealth, or upon the petition of any political subdivision of the commonwealth determine the issue in equity or in a petition for declaratory relief, and may, before the final determination of the cause, restrain the person causing or about to cause such damage; provided, however, that the damage caused or about to be caused by such person constitutes a violation of a statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment. . . .

"Nothing contained in this section shall be construed so as to impair, derogate or diminish any common law or statutory right or remedy which may be available to any person, but the cause of action herein authorized shall be in addition to any such right or remedy."

[2] Also named as defendants were the seven members and two of the officers of the Authority, and the construction company (Vappi & Company, Inc.) with which the Authority intended to, and subsequently did, contract to construct the passenger terminal and parking garage. Subsequently, the corporation (South Terminal Corporation), which will lease the new terminal, and four airlines (American Airlines, Inc., Allegheny Airlines, Inc., National Airlines, Inc., and Northwest Airlines, Inc.), which will occupy it, were permitted to intervene as defendants.

[3] The relevant sections of the Department's regulations are set out in the appendix to this opinion. General Laws c. 111, §§ 142A-142E, are summarized below.

§ 142A — Authorizes the Department to adopt regulations to prevent pollution of the atmosphere. Violation of such regulations by "[a]ny municipality, corporation or person" is punishable by fine.

§ 142B — Establishes a metropolitan air pollution control district for the Boston area. The Department is directed to control pollution of the atmosphere in said district, and is authorized to prescribe rules and regulations to accomplish such control. The Department is empowered to order "any person, corporation, or political subdivision" to stop or abate violations of such rules and regulations. Orders of the Department are enforceable by fines and by petition to the Superior Court by the Department or by any person with the Department's authorization.

§ 142C — Authorizes two or more political subdivisions, with approval of the Department, to form air pollution control districts. The Department has the same powers, duties, and rights to control air pollution in such districts as are granted in § 142B.

c. 30, § 61.[4] The defendants filed answers to the bill, and, after a partial trial, the judge of the Superior Court entered findings, rulings, and an order for a decree. Thereafter, he entered a final decree in which he declared that the Department's regulations are inapplicable to the Authority, that the Authority had complied with G. L. c. 30, § 61, and that because there was no violation of § 61, there was no basis under G. L. c. 214, § 10A, for further review of the action taken by the Authority under § 61. Having thus declared the "rights, duties and status" of the parties, the judge dismissed the bill. This appeal presents for our decision the correctness of the judge's rulings of law and the propriety of his decree dismissing the bill. We hold that the ruling that the Authority has not violated G. L. c. 30, § 61, was correct, but that the conclusion that the Department's regulations do not apply to the Authority for the reasons stated was incorrect. The decree dismissing the bill must, therefore, be vacated and the case remanded to the Superior Court for further proceedings (see fn. 15, *infra*).

The factual context in which this controversy arose may be briefly summarized. The Authority was created by the Leg-

---

§ 142D — Authorizes the Department to establish air pollution control districts compatible with districts designated under the Federal Air Quality Act of 1967, to alter or abolish existing districts, and to establish ambient air quality standards and a plan to implement such standards. The powers, duties, and rights of the Department in controlling air pollution in districts created under this section shall be as provided in § 142B.

§ 142E — "All departments, agencies, commissions, authorities and political subdivisions shall be subject to rules and regulations adopted by the department pursuant to sections . . . [142A-142C]." The Department may enforce this provision by orders to cease and desist from violations of such rules and regulations. A State agency which objects to such an order has a right to a hearing and to judicial review, under G. L. c. 30A, of the Department's "final decision." The Department may enforce its order by a suit in the Superior Court to enjoin violations thereof.

[4]Section 61, which together with § 62 of the same chapter is known as the environmental policy act, provides in pertinent part:

"All agencies, departments, boards, commissions and authorities of the commonwealth shall review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them and shall use all practicable means and measures to minimize damage to the environment. Unless a clear contrary intent is manifested, all statutes shall be interpreted and administered so as to minimize and prevent damage to the environment. Any determination made by an agency of the commonwealth shall include a finding describing the environmental impact, if any, of the project and a finding that all feasible measures have been taken to avoid or minimize said impact."

islature in 1956 as a "public instrumentality," one of its functions being to own and operate Logan Airport. St. 1956, c. 465. On April 12, 1973, at a special meeting, a majority of the members of the Authority voted to authorize the execution of a contract for the construction of the so called South Terminal at Logan Airport. The plans for such a terminal included a provision for a five-story automobile parking garage with 2,700 parking spaces. On the same day, April 12, the State Commissioner of Public Health (Commissioner) notified the Authority's executive director by letter that the Department considered the construction of the South Terminal parking garage to be within the scope of certain air pollution control regulations adopted by the Department pursuant to G. L. c. 111, § 142D. Those regulations, inter alia, prohibit the construction of any "facility" which may contribute to a condition of air pollution until the plans and specifications for such facility are reviewed and approved by the Department. The Commissioner therefore requested that the plans and specifications for the garage be submitted to the Department. In a separate letter of the same date to the chairman of the Authority, the Commissioner urged the Authority not to execute a contract for construction of the garage until the Authority and the Department could resolve the "very serious questions" concerning the application of the regulations.

On April 13 the city of Boston commenced this suit in the Superior Court. On April 19 or 20 the Commissioner requested from the Attorney General his opinion "as to the applicability of . . . [the Department's] regulations to the Massachusetts Port Authority." (In the letter stating this request the Commissioner mentioned that the city had requested that the Department join in the city's suit against the Authority.) In a letter dated April 21, supplemented by another dated April 24,[5] the Attorney General stated as his opinion that the Authority, by virtue of § 2 of its enabling

---

[5]Neither letter from the Attorney General appears in the record. However, the letter dated April 21 is referred to and relied on by the judge in his rulings, and both letters are referred to in both plaintiff's and defendants' briefs.

act,[6] is exempt from the Department's air pollution control regulations. In a letter dated April 24,[7] the Commissioner informed the executive director of the Authority that, in light of the Attorney General's ruling, the Department could not enforce its air pollution control regulations against the Authority. The Commissioner expressly reserved his right to reverse that decision in the event that the Superior Court, in the suit brought by the city, ruled that the Authority is in fact not exempt from such regulations.

On April 25 the Authority and Vappi & Company, Inc., executed the contract for construction of the South Terminal, and on or about April 30, construction work began and has since continued. On May 2 the judge entered his findings, rulings, and order for decree. A final decree was entered on May 7 dismissing the bill.

The plaintiff's bill comprises two principal claims which we shall deal with separately. The first claim concerns the Authority's failure to obtain prior approval of its plans for the South Terminal garage from the Department in accordance with the allegedly applicable air pollution control regulations. The second claim concerns the alleged failure of the Authority fully to comply with the requirements of G. L. c. 30, § 61. Before reaching these issues, however, we must first consider the challenge raised by the defendants to the plaintiff's standing to maintain this action under G. L. c. 214, § 10A.

## A.  *Jurisdiction under § 10A.*

The question of the plaintiff's standing was neither raised by the defendants' pleadings nor argued during the pro-

[6]Statute 1956, c. 465, § 2, provides, in relevant part: "There is hereby created and placed in the department of public works a body politic and corporate to be known as the Massachusetts Port Authority, which shall not be subject to the supervision or regulation of the department of public works or of any department, commission, board, bureau or agency of the commonwealth except to the extent and in the manner provided in this act. The Authority is hereby constituted a public instrumentality and the exercise by the Authority of the powers conferred by this act shall be deemed and held to be the performance of an essential governmental function."

[7]This letter does not appear in the record, but is reproduced in the appendix to the defendants' brief as an exhibit to an affidavit in support of a "Motion to Dismiss Appeal in Part."

ceedings in the Superior Court. We would, therefore, ordinarily decline to consider it at this juncture. *Lyon* v. *Bloomfield,* 355 Mass. 738, 743 (1969). However, the gravamen of the defendants' argument before this court raises not an issue of standing but rather an issue of jurisdiction. The defendants argue that the bill is insufficient under the terms of § 10A in that there is no allegation that the environmental damage which allegedly is "about to occur" because of the construction of the parking garage "constitutes a violation of a statute, ordinance, by-law or regulation." The only allegation of any "violation" concerns the Authority's failure to submit its garage plans for the Department's approval and its failure to comply with § 61 of c. 30. These are not the type of violations to which the statute speaks. Therefore, say the defendants, the plaintiff has no standing to maintain this suit under § 10A. But clearly this argument does not go to the plaintiff's standing, which is expressly established by the statute ("upon the petition of any political subdivision of the commonwealth"). Instead, it raises the question whether the plaintiff's allegations are sufficient to invoke the jurisdiction of the Superior Court under the terms of § 10A.[8]

The jurisdictional issue implicit in the defendants' argument must be decided, regardless of the point at which it is first raised. *Witzgall* v. *Witzgall,* 334 Mass. 365, 368 (1956). In order to invoke the jurisdiction of the Superior Court under G. L. c. 214, § 10A, there must be an allegation that "damage to the environment is occurring or is about to occur," and it must further be alleged that such damage "constitutes a violation of a statute . . . or regulation the major purpose of which is to prevent or minimize damage to the environment." The bill in the present case is adequate in all respects but one: it is not the damage to the environment

---

[8] Although jurisdiction is alleged under G. L. c. 231A as well as under § 10A, the city relies primarily on the latter statute. Reliance on § 10A is proper, we think, as the city might be unable to meet the requirements of c. 231A that there be an actual controversy between the parties to the suit and that all persons with an interest in the suit must be made parties. See, e.g., *Povey* v. *School Comm. of Medford,* 333 Mass. 70 (1955).

(i.e., increased air pollution) which is alleged to constitute the violation of the statute or regulation. Rather, the violations alleged are merely procedural failures, i.e., failure to obtain prior approval of the garage plans and inadequate compliance with § 61. Thus, whereas the scheme of § 10A appears to contemplate that the court is to determine whether damage to the environment is in fact occurring or about to occur, whether such damage constitutes a "violation," and whether it should therefore be enjoined, the present bill would have the court decide merely procedural questions having no immediate bearing on any actual damage to the environment. The remedy provided in § 10A is clearly available to enforce the substantive prohibitions of environmental statutes and regulations; we must now decide whether it is also available to enforce the procedural requirements of those same statutes and regulations.

We hold that the present bill is sufficient to invoke the jurisdiction of the Superior Court under § 10A. The legislative intent underlying that provision is broadly stated in the title under which it was enacted: "An Act establishing a cause of action in behalf of certain persons and political subdivisions for the purpose of protecting the natural resources and environment of the commonwealth." St. 1971, c. 732. In submitting proposed legislation permitting environmental suits to be brought by citizens, the Governor indicated that his intention was to permit "the citizen to join in the enforcement of the battery of anti-pollution laws we have passed in recent years." 1971 House Doc. No. 5023. We believe that these broad statements of purpose are incompatible with a narrow, technical interpretation of § 10A which would limit the operation of the statute to the enforcement of only prohibitory environmental laws and regulations. The present case exemplifies the anomalous result to which such an interpretation would lead.

"Damage to the environment" as defined in § 10A expressly includes air pollution. The principal legislative and administrative response to the problem of air pollution in Massachusetts is contained in G. L. c. 111, §§ 142A-142E,

and the Department's regulations adopted pursuant to those sections. Nowhere in §§ 142A-142E is there any provision which expressly prohibits pollution of the air. Instead, those sections, in broad outline, empower the Department to establish a regulatory scheme for the prevention and control of air pollution. The scheme which the Department has adopted, as set forth in its regulations, constitutes a comprehensive attempt to deal with a complex problem. In fulfilling its legislative mandate the Department has decided not only expressly to prohibit certain practices (e.g., Reg. 2.5, "Emission Limitations") but also to establish certain procedural requirements (e.g., Reg. 2.1, requiring prior departmental approval of plans for the construction or alteration of certain facilities; Reg. 12.1, requiring annual registration of certain pollution sources). If we were to adopt a narrow construction of G. L. c. 214, § 10A, the consequence would be that only one part of the State's air pollution regulatory program could be enforced by petition under that section. For example, a petition under § 10A would lie to enforce the Department's emissions limitations on an operating "industrial facility," Reg. 2.5.2, but would not lie to require submission for the Department's approval of the plans for such facility prior to its construction, Reg. 2.1. We perceive no reason to conclude that the Legislature intended such a result. The Department's regulatory scheme is comprehensive, with each part necessary to the accomplishment of the end goal of preventing air pollution. If one of the principal purposes (i.e., the prevention of air pollution) of § 10A is to be realized, then a petition under that section must lie to enforce the entire air pollution regulatory scheme.[9] We hold, therefore, that a petition under § 10A will lie to enforce the procedural as well as the prohibitory provisions of the Department's regulations.[10]

---

[9]The fact that § 142B contains its own provisions for resort to the courts to enforce air pollution control regulations does not exclude the operation of § 10A. The final paragraph of § 10A expressly provides that the cause of suit therein authorized shall be in addition to any existing right or remedy.

[10]Support for this result is suggested in a dictum in our rescript opinion, *Christoffels* v. *Alton Properties, Inc.* 362 Mass. 862. (1972), in which it is implied that a

B. *Applicability of the Department's Regulations to the Authority.*

We move now to consideration of the merits of the plaintiff's claims, dealing first with the question of the applicability of the Department's air pollution control regulations to the Authority.[11] The defendants contend that this question actually involves "four broad areas of dispute." They argue that they should prevail on any or all of the following grounds: (1) the Department's regulations do not by their own terms apply to the South Terminal parking garage; (2) the regulations were never validly adopted for the air pollution control district in which Logan Airport is situated; (3) the regulations were adopted, if at all, pursuant to G. L. c. 111, § 142D, and thus are not made applicable to authorities by the terms of § 142E; and (4) in any event, § 2 of the Authority's enabling act (St. 1956, c. 465) exempts it from any attempted regulation by the Department unless such regulation is provided for in the enabling act. Of these four contentions, however, only the latter two were relied on by the Superior Court judge as bases for his ruling on the plaintiff's first claim.[12] As to the first two, the judge express-

petition under § 10A may be brought to prevent violations of G. L. c. 131, § 40 (as amended through St. 1971, c. 1020). It is significant that c. 131, § 40, is entirely "procedural" in that it prescribes the steps to be taken before any dredging or landfill activities may be conducted in certain wetland areas.

[11]The defendants have entered in this court a "Motion to Dismiss Appeal in Part" in which they ask us to dismiss as moot so much of this appeal as relates to the first of the city's claims. This motion is apparently based on the Commissioner's decision, based on the Attorney General's opinion, not to attempt to enforce the Department's regulations against the Authority. The defendants did not press this motion during oral argument. Indeed, counsel even urged us at that time to reach the merits of certain aspects of this claim. In any case, the fact that there is no present controversy between the Authority and the Department does not foreclose the plaintiff's right under G. L. c. 214, § 10A, to assert these claims. We deny the motion for partial dismissal.

[12]The precise basis of the judge's ruling is not clear. He first considered whether § 142E might be deemed to have repealed § 2 of the Authority's enabling act by implication. After quoting the Attorney General's opinion that no such repeal was implicit in § 142E, and after stating the rule of construction disfavoring repeals by implication, the judge then went on to consider whether regulations adopted under § 142D were intended to apply to public bodies such as the Authority. He concluded that § 142E on its face showed precisely the opposite intention, and he therefore ruled "that the existing regulations of the Department of Public Health do not apply to the Massachusetts Port Authority." We assume that the final ruling rested on both grounds considered by the judge.

ly declined to decide whether the regulations on their own terms could apply to a parking garage,[13] and he made no mention at all of whether the regulations were validly adopted.[14] Thus, on this record, the only questions now before us concern, first, the applicability of § 142E to regulations purportedly adopted pursuant to § 142D, and second, the exemption of the Authority from regulation by § 2 of its enabling act.[15]

By the terms of § 142E only regulations adopted "pursuant to" §§ 142A-142C, inclusive, are made applicable to "[a]ll departments, agencies, commissions, authorities and political subdivisions." The trial judge concluded that the exclusion of regulations adopted pursuant to § 142D from the coverage of § 142E indicated a legislative intent that "public bodies (including the Authority) not be subject to any regulations adopted under that section [i.e.,§ 142D]." Since the only explicit authority cited by the Department for the adoption of its regulations is § 142D,[16] the judge concluded that those regulations could not apply to the

_____

[13]The judge's precise statement was: ". . . it is questionable whether the regulations in issue apply by their own terms to the South Terminal parking garage. However, in light of the preceding rulings it is not necessary at this time to rule on that issue."

[14]The judge did state in his rulings: "The regulations upon which the City relies were adopted pursuant to Massachusetts General Laws c. 111, § 142D." We do not infer from this that he did in fact consider the question of the validity of the adoption of the regulations.

[15]The defendants assert that the record before this court is sufficient to permit us to consider, and resolve, all four of their "broad areas of dispute." We note, however, that subsequent to the close of evidence in the Superior Court both the plaintiff and the defendants have attempted to supplement the record with additional documentary evidence purportedly relevant to the two issues which we have declined to decide. On the day after the entry of the judge's findings, rulings, and order for decree, the plaintiff ordered in evidence a copy of the minutes of a meeting of the Public Health Council, which minutes purportedly are relevant to whether regulations were ever adopted for the air pollution control district which encompasses Logan Airport. In addition, the defendants have filed in this court a "motion . . . to supplement the record . . ." with documentary evidence purportedly relevant to whether the Department's regulations by their own terms apply to a parking garage. These efforts by the parties to supplement the evidence suggest to us that the present record is not complete as to these two issues. It is therefore appropriate that we leave for the Superior Court on remand not only the resolution of those two issues on which it has not yet ruled but also the determination of what evidence it will consider in reaching that resolution.

[16]The citation of § 142D is made in a letter forwarding the regulations to the Secretary of the Commonwealth, on the cover and in the foreword of the regulations themselves, and in the same places in a subsequent amendment to the regulations.

Authority. We disagree.

No authority to adopt rules and regulations is expressly granted in § 142D (except to the extent that "standards" might be deemed to be regulations. See G. L. c. 30A, § 1 [5]). That section merely authorizes the Department to establish air pollution control districts compatible with the air quality control regions designated under the Federal "Air Quality Act of 1967" (see 42 U. S. C. §§ 1857-1857 1 [Supp. V, 1965-1969]),[17] to adopt "ambient air quality standards applicable to said districts," and to adopt "a plan for the implementation, maintenance and attainment of such standards." The section closes with a provision that: "The powers, duties and rights of the department in the exercise of air pollution control in districts established under this section . . . shall be as provided in . . . [§ 142B]." Thus, any authority in § 142D to adopt rules and regulations can come only from the reference to § 142B just quoted.[18] We are left, then, with the somewhat metaphysical problem of whether regulations which are adopted by the Department to apply to air pollution control districts created under § 142D should be deemed to be adopted "pursuant to" § 142D, and thus outside the scope of § 142E, or "pursuant to" § 142B, and thus, under § 142E, applicable to "[a]ll . . . authorities." We believe that the latter interpretation is the one intended by the Legislature.

The judge's interpretation of §§ 142D and 142E, if correct, would mean that the Legislature has mandated the creation of duplicate air pollution schemes for the State, one under §§ 142A-142C and another under § 142D. The import of the ruling below is that the Department may establish air pollution control districts and may adopt regulations applicable

---

[17]The citations to the Federal statute are to the sections as originally enacted in 1967 and as they existed in 1969 when the State legislative committee was drafting its proposed legislation. The sections cited were substantially changed by a 1970 amendment.

[18]Section 142B clearly authorizes the Department to adopt regulations: "The department shall control the pollution of the atmosphere within said district. The department may from time to time . . . prescribe and establish . . . rules and regulations to prevent pollution . . . of the atmosphere within said district."

to those districts under § 142D. However, if it wishes to enforce its regulations against "public bodies" in those districts it cannot do so pursuant to § 142D; it must also establish those districts and adopt regulations applicable thereto pursuant to §§ 142A-142C in order to invoke § 142E. It is not inconceivable that the Department might be required to take all administrative actions relative to the State's air pollution control districts pursuant both to §§ 142A-142C and to § 142D, thus avoiding any gap in its coverage, but we do not believe that the Legislature intended to impose any such cumbersome procedural requirement. The legislative history of §§ 142D and 142E supports our conclusion.

The original versions of the bills which were eventually enacted as §§ 142D and 142E were among several bills proposed in 1969 by a special joint legislative committee on air pollution.[19] In drafting these bills the committee was expressly cognizant of the requirements of the Federal Air Quality Act of 1967.[20] In its draft of § 142D (which is substantially identical to § 142D as enacted) the committee clearly intended to harmonize the State's air pollution control scheme with the Federal scheme, and to grant to the Department the powers necessary to comply with the Federal legislation. For example, the Department may establish air pollution control districts compatible with the Federal air quality control regions (see 42 U. S. C. § 1857c-2 [Supp. V, 1965-1969]) and the Department may adopt ambient air quality standards, and a plan to implement such standards (see 42 U. S. C. § 1857d [c] [1] [Supp. V, 1965-1969]). For the "powers, duties and rights" necessary to the Department to "exercise . . . air pollution control" in such districts, however, reference was merely made to those powers already provided in § 142B (originally enacted in 1960). Thus, it would appear that the primary purpose underlying § 142D was to ensure conformity between the State and Federal air pollution con-

---

[19]Third Interim Report of the Special Joint Legislative Committee on Air Pollution, 1969 House Doc. No. 5639, Appendices A, C.

[20]The reference to that act in § 142D was included in the committee's draft. *Id.* at Appendix A.

trol mechanisms by providing the Department with the authority, in addition to that already provided in §§ 142A-142C, necessary to comply with certain Federal requirements. There is no reason to assume that a second system of air pollution control districts, with coverage different from the system authorized by §§ 142A-142C, was contemplated by the Legislature.

Along with the proposed § 142D the legislative committee also submitted a proposed § 142E (which is substantially identical to § 142E as enacted). This section applied regulations adopted pursuant to §§ 142A-142C to authorities and other public bodies. At the time this bill was drafted § 142D was, of course, merely a proposal, and thus the failure to refer to it might be explained by the fact that it was not yet part of the General Laws.[21] It appears more probable, however, that the Legislature never intended that any regulations would be adopted "pursuant to" § 142D. In a 1972 amendment to § 142B, the Legislature empowered the Department to issue orders to stop or abate violations of "any of the *rules and regulations* adopted pursuant to this section [i.e., § 142B] or of any of the *rules and regulations* adopted under the provisions of section one hundred and forty-two A and *standards* adopted under . . . [§ 142D]" (emphasis supplied). St. 1972, c. 359, § 1. The phrasing of this amendment indicates that the Legislature intended that "standards" were to be adopted pursuant to § 142D, but regulations and other measures to enforce those standards were authorized only in §§ 142A and 142B. Thus, the most reasonable explanation of the omission of any reference to § 142D in § 142E is that the Legislature did not intend regulations to be adopted "pursuant to" § 142D. Regulations to enforce the provisions of § 142D must be deemed to be adopted "pursuant to" the terms of § 142B, and therefore are in fact applicable to public bodies under § 142E.[22]

[21]Section 142E was enacted, however, one year after the enactment of § 142D. Section 142D was added by St. 1969, c. 836, and § 142E was added by St. 1970, c. 838.

[22]The fact that the Department expressly stated that its regulations were adopted "pursuant to § 142D" does not invalidate the regulations since § 142B is incorporated

We are now squarely presented with the final issue raised by the plaintiff's first claim: how to reconcile the mandate of § 142E that "all . . . authorities . . . shall be subject to" the Department's regulations with the mandate of § 2 of the Authority's enabling act that the Authority "shall not be subject to the supervision or regulation . . . of any department, commission, board, bureau or agency of the commonwealth except to the extent and in the manner provided in this act." St. 1956, c.465. Although there has been no amendment of the enabling act subjecting the Authority to the Department's air pollution regulations, we nevertheless hold that the absolute language of the enabling act must yield to the equally absolute language of § 142E.

In reaching this conclusion we start from the fact that the provision of § 142E here in question merely expands the scope of coverage of regulations adopted under §§ 142A and 142B. Those sections by their own terms originally applied to "[a]ny municipality, corporation or person" [§ 142A] and to "any person, corporation or political subdivision" [§ 142B]. Section 142E extends their already broad application to include "[a]ll departments, agencies, commissions, authorities and political subdivisions." This development is significant for two reasons. First, it is some evidence that the Legislature intended that the air pollution control scheme devised under §§ 142A-142E is to be universally applicable throughout the State.[23] Second, the fact that the regulations are enforceable against public bodies to the same extent that they are enforceable against individuals and private businesses greatly undercuts the Authority's most persuasive argument for broad application of its "exemption" from regulation, that is, that the Authority was intended to be as

by reference in § 142D. In addition, in the minutes of the meeting at which such regulations were adopted and in the foreword to the regulations themselves, the Department cites § 142D "and all other appropriate enabling acts" as authority for their issuance. Section 142B is, of course, an "appropriate enabling act."

[23]Indeed, there appears to be no legal entity not covered somewhere in the terms "person," "corporation," "political subdivision," "municipality," "department," "agency," "commission," and "authority," particularly in light of the definition of "person" in G. L. c. 4, § 7, as including "societies, associations and partnerships."

free from State regulation as any private business.

The Authority's contention that it was created in order to permit the management of two State-owned airports[24] and the port of Boston in a businesslike manner is based principally on the findings and recommendations of a special commission created by the Legislature prior to the creation of the Authority.[25] The commissioners found that the airport and port operations were essentially business operations which were being "delayed and hampered in their operations as business enterprises, sometimes for several years, by an intricate and complex web of legislative and executive controls over policy, management, budgeting, financing, personnel and building construction."[26] The commissioners concluded that the airport and port should be turned over to an authority, the members of which "would operate the Authority as the directors of any business corporation should manage affairs, and that is on a businesslike basis."[27] (Among the "desirable businesslike characteristics" the Authority was to have was freedom from the usual State controls over building construction.)[28] Admittedly the Commission report provides persuasive evidence that the purpose of the exemption in § 2 of the enabling act was to ensure that the Authority would be free to act essentially as a private business rather than as a State agency. The defendants would have us go further, however, and find in the report evidence of a legislative intent to exempt the Authority even from regulation which applies to private businesses as well as to public agencies unless the Legislature has amended the Authority's enabling act explicitly to permit such regulation. This we cannot do.

The consequence of the defendants' interpretation of § 2 of the Authority's enabling act would be that a small group

---

[24]The Authority manages Hanscom Field in addition to Logan Airport.

[25]Report of the Special Commission on the Massachusetts Port Authority, 1956 House Doc. No. 2575.

[26]*Id.* at 12.

[27]*Id.* at 25.

[28]*Id.* at 108 (Appendix F).

of State authorities[29] would have a unique exemption from the regulatory power of the State, an exemption available to no other person or legal entity, public or private.[30] The extent of this exemption would be such that no legislation authorizing State regulation of any activity or subject, regardless of the breadth of its language and the generality of its application, would supersede such exemption except by express reference to and amendment of the enabling act of each such authority. Thus, in the present case, the Legislature by c. 111, §§ 142A-142E, has authorized and directed the creation of a comprehensive regulatory scheme for attacking the Statewide problem of air pollution. This legislation on its face demonstrates a legislative awareness that any scheme to control and prevent air pollution must apply to all sources of such pollution, whether privately or publicly controlled. Yet the defendants contend that the Authority and its fellow authorities with similar enabling acts occupy a special status in that they are exempt from this regulatory scheme, free to engage in air polluting activities or not as they in their sole discretion choose unless and until the Legislature expressly amends their enabling acts to subject them to air pollution control regulation. This contention is, of course, inconsistent with the argument that the Legislature intended to free the Authority from State regulation to the same extent that a private business is free from such regulation. Because private businesses are subject to air pollution control regulation under §§ 142A-142E, it follows that the Authority should also be subject to such regulation.

The defendants cite several special acts which, they argue, demonstrate the Legislature's understanding that the Authority's enabling act must be amended if the Authority is to be subjected to any type of regulation by a State agency.

---

[29]The enabling acts of several other authorities also contain language, similar to that in St. 1956, c. 465, § 2, exempting them from regulation. See, e.g., St. 1952, c. 354, § 3 (Massachusetts Turnpike Authority); St. 1958, c. 606, § 3 (Massachusetts Parking Authority).

[30]Because we decide that the Authority is not exempt from regulation by the Department, we need not consider any constitutional issues which may be implicit in the defendants' interpretation of the Authority's enabling act.

See St. 1961, c. 384; St. 1962, c. 760; St. 1971, c. 295. The acts cited, however, demonstrate no more than that the Legislature has on occasion expressly referred to the Authority in legislation which it wishes to be applicable to the Authority. In fact, these acts undermine the defendants' argument in that in two of them the Legislature did not bother to amend the Authority's enabling act. For example, St. 1971, c. 295, provides that, "[n]otwithstanding any provision of law to the contrary," the Authority must submit lists of its tax-exempt property to, inter alia, the State Department of Corporations and Taxation. Nothing in that act expressly amends the enabling act, yet the defendants do not suggest that the Authority is free to ignore its requirements.[31] Even more significant is St. 1962, c. 760, which empowers the Authority and three other named authorities to bargain collectively with their employees. In addition, "[n]otwithstanding any provision of law to the contrary," the Authority is made subject to the provisions of various sections of G. L. c. 150A dealing with labor relations. Once again there is no express amendment of the Authority's enabling act, yet among the provisions of c. 150A which are made applicable to the Authority are §§ 5, 6, 6A and 7, which give the State Labor Relations Commission various powers to regulate elections of collective bargaining representatives, to determine collective bargaining units, and to investigate and prevent unfair labor practices. Quite clearly St. 1962, c. 760, subjects the Authority to regulation by a State commission without any amendment of the enabling act expressly authorizing such regulation.

The defendants, apparently realizing that the special acts cited do not support the contention that § 2 requires express amendment of the enabling act, advance the alternative argument that those acts at least demonstrate that § 2 "requires special legislation specifically applicable to the Authority in order to subject it to state regulation." But even this more

---

[31] It cannot be argued that the language "notwithstanding any provision of law to the contrary" constitutes an express amendment of the enabling act, and the defendants do not so argue.

limited interpretation is undermined by G. L. c. 22, § 13A, which, by general law, expressly subjects the Authority (at least in so far as it owns "public buildings") to regulation by the State board to facilitate the use of public buildings by the physically handicapped. Thus, it would appear that the defendants' argument is reduced to the proposition that § 2 of the enabling act exempts the Authority from all State regulation except such as is authorized by a statute, either general or special, which contains express reference to the Authority. As to this final argument, however, we hold that the language "*all* . . . authorities" (emphasis supplied), used in G. L. c. 111, § 142E, is sufficient to encompass the Authority even absent any explicit reference. It seems to us reasonable to believe that the Legislature would have chosen another adjective if it had intended to reach less than "all" authorities. "[W]here the language of a statute is plain there is no room for speculation as to its meaning or its implication. The Legislature must be presumed to have meant what the words plainly say . . .." *Condon* v. *Haitsma,* 325 Mass. 371, 373 (1950).[32]

In conclusion, we emphasize the narrow basis of our present decision on this issue. It is clear that the language of the enabling act that the Authority "shall not be subject to the supervision or regulation of . . . any department . . . of the commonwealth . . ." was intended to have some effect. However, we believe it is unnecessary to attempt a definition in general terms of the precise scope of the Authority's "exemption" from the several jurisdictions of the various State regulatory and supervisory bodies.[33] Thus, our present

---

[32]See *Doherty* v. *Commissioner of Admn.* 349 Mass. 687 (1965), in which we held that the provision of St. 1962, c. 757, that the Commissioner of Administration "shall appoint *all* employees of the executive office for administration and finance" (emphasis supplied in the court's opinion at 689) repealed, by implication, an earlier provision of G. L. c. 8, § 4, that the State superintendent of buildings was to appoint capitol police officers (who were employees of the Executive Office for Administration and Finance).

[33]We are not unaware of the potential ramifications of this decision. Three amici curiae (the Regional Administrator for Region I of the Environmental Protection Agency, the Executive Office for Environmental Affairs of the Commonwealth, and the Sierra Club) have submitted briefs, each urging on us the importance of the present issues in each of their areas of concern. In addition, our decision in this case will

holding is limited to the following: the exempting provision of § 2 of St. 1956, c. 465, does not exempt the Authority from a regulatory scheme which is designed to alleviate a pervasive public health problem and which, by virtue of the statutes authorizing it, is universally applicable to private and public entities, including "[a]ll . . . authorities."

### C. *Compliance with G. L. c. 30, § 61.*

There remains for our consideration the second issue raised by the plaintiff's bill, which is whether the Authority has adequately complied with the requirements of G. L. c. 30, § 61.

At the same meeting (April 12, 1973) at which the contract for construction of the South Terminal project was authorized, the members of the Authority also adopted a resolution in which it was declared that the Authority had made certain determinations as to the environmental impact of its proposed "1973 Improvements" (one of which was the South Terminal project). The language of the resolution essentially paraphrased the requirements of § 61 that all authorities "shall review, evaluate, and determine the impact on the natural environment" of their activities and "shall use all practicable means and measures to minimize damage to the environment." The "finding" determined by the Authority was that "substantially no adverse effect on the environment will result from construction of the 1973 Improvements."[34] The judge ruled that the resolution of the Authority was on its face conclusive evidence of the Author-

obviously have implications both for other authorities with enabling acts similar to that of the Authority and for future interpretation of statutory schemes similar to G. L. c. 111, §§ 142A-142E.

[34]The full text of this resolution was: "(f) The Authority has determined to construct certain additional extensions, enlargements and improvements (hereinafter sometimes called the 1973 Improvements) of the Airport Properties and the Port Properties (as defined in the Trust Agreement), has adopted design standards and specification requirements for such construction, and has carefully reviewed the 1973 Improvements and has evaluated the impact on the environment of said Improvements and has determined, based on such review and evaluation, that substantially no adverse effect on the environment will result from construction of the 1973 Improvements according to the design standards and specification requirements previously adopted. In constructing the 1973 Improvements, it is the Authority's intention to use all practical means to minimize damage to the environment. The 1973 Improvements are described in brief and general terms below."

ity's compliance with § 61. In addition, the judge determined that § 61 must be read in conjunction with § 62[35] as a "comprehensive legislative attempt to deal with environmental problems." Because § 62 was not effective until July 1, 1973,[36] almost two months after the close of the trial of this case, the trial judge concluded that as to § 61, there "are no specific standards to follow or studies and reports to be made; nor are there any provisions for enforcement; or review of a public body's compliance with its terms." His only function, therefore, was to determine whether the Authority "took cognizance of § 61." Since the Authority's resolution was conclusive evidence on that question, he ruled that there was no violation of § 61 and, because there was no violation of a statute, there was no basis under G. L. c. 214, § 10A, for further review of the Authority's action. The sole question presented by this ruling is whether the judge should have permitted the plaintiff to offer evidence, extrinsic to the resolution, concerning the adequacy of the Authority's compliance with the requirements of § 61. We hold that, in the particular factual circumstances of this case, the judge's ruling was correct.

The plaintiff vigorously argues that judicial review of the Authority's compliance with § 61 is necessary if the requirements of that section are not to be circumvented by mere recitals of the statutory language unsupported by any actual evaluation of environmental impact.[37] To this conten-

---

[35]Section 62 requires every "agency, department, board, commission, or authority" to publish an environmental impact report prior to the commencement of "any work, project, or activity." The section sets forth certain standards with which such reports must comply. The secretaries of the several executive offices are required to promulgate rules and regulations, applicable throughout their departments, to carry out the purposes of the section. Such rules and regulations are subject to the approval of the Secretary of Environmental Affairs and must "conform with the requirements of the National Environmental Policy Act Pub. Law 91-190." All impact reports are subject to review by the Secretary of Environmental Affairs.

[36]Sections 61 and 62 were both added by St. 1972, c. 781, § 2, but § 61 was effective as of December 31, 1972, while § 62 was not effective until July 1, 1973.

[37]We have, in other contexts, declared invalid administrative rulings for failure to include explicit findings beyond "a bare recital of the statutory conditions." *McNeely* v. *Board of Appeal of Boston,* 358 Mass. 94, 103 (1970), and cases cited. But those cases are inapposite here because, as we discuss below, the Legislature has itself provided, in § 62, for the type of data which must be produced to support findings and determinations made pursuant to § 61.

tion there are two responses. First, it is not to be presumed that public officials, including members of the Authority, will fail to comply with the law. See *Comerford* v. *Meier,* 302 Mass. 398, 403 (1939), and cases cited. Second, § 61 gives assurance that the requirements of § 62 will receive more than mere lip service. As interpreted by the Executive Office of Environmental Affairs, § 61 should "be viewed as the last step of a process designed to lead to the full disclosure of environmental impact through the . . . § 62 procedures and then to the actual avoidance or minimizing of adverse environmental impact by decisions made in compliance with . . . § 61. Section 61 sets the environmental standards for agency decisions, the section 62 process will provide the evidence for such decisions."[38] Thus, it is the environmental impact report required by § 62 which is to provide the data on which § 61 decisions are to be based and against which such decisions may be evaluated.

Because of the six month interval between the effective dates of §§ 61 and 62, the Authority was not required to prepare an environmental impact report for the South Terminal project even though it was subject to the requirements of §61.[39] The absence of such a report, of course, deprives a reviewing court of the principal source of data which might be used to review the findings and determinations made by the Authority. The plaintiff suggests that we interpret the two "finding[s]" required by § 61 as requiring "an explanatory statement of the subsidiary facts and reasons which support the agency's ultimate determination of environmental impact and steps taken to mitigate this impact."

---

[38]Regulations to Create a Uniform System for the Preparation of Environmental Impact Reports, § 1.3.

[39]Because § 61 is, in the words of the defendants, "a policy directive to the Authority itself . . . [which] does not provide for 'supervision or regulation' of the Authority" by any State agency or department, the Authority concedes that it is subject to the requirements of § 61 notwithstanding the exemption contained in § 2 of its enabling act. The Authority has made no such concession, however, as to whether it is subject to the regulatory requirements of § 62. For purposes of this decision, we assume that the Authority is subject to § 62.

Such an interpretation would, of course, almost precisely overlap the requirements of § 62 that an environmental impact report contain "detailed statements" of the work to be performed and of its environmental impact plus a statement of "all measures being utilized to minimize environmental damage." But the Legislature quite clearly intended to impose no such requirements until July 1, 1973, at least two months after both this action and construction of the South Terminal project were commenced. In effect, the plaintiff here is asking us to abrogate the effect of the staggered effective dates of the statutes by judicially imposing a requirement that the Authority prove its compliance with § 61 by presenting virtually the same information which would be required in a § 62 impact report. We decline to circumvent the clear legislative intent in such a manner. The Authority's resolution contained assertions that the environmental impact of the South Terminal project had been reviewed, evaluated, and determined, and in addition contained both "finding[s]" required by § 61. Prior to the effective date of § 62, there was no basis for requiring any additional evidence of the Authority's compliance with § 61.

Our resolution of this issue is not inconsistent with our prior decisions concerning the proper scope of judicial review of administrative actions. In *Cambridge Elec. Light Co.* v. *Department of Pub. Util.* 363 Mass. 474 (1973), we summarized those decisions. A court reviewing administrative actions which are adjudicatory in nature "should search the factual and legal basis of the agency action to see that justice was done, and this is helped by the agency's furnishing an explanatory statement which the court can examine and criticise." *Id.* at 490. On the other hand, as to administrative actions which are regulatory in nature "[n]o such process is needed, nor would it usually be desirable . . .; for the court to check back on the agency's 'reasons' and 'determination[s]' of fact and law would have an unhealthy tendency to substitute the court for the agency as policymaker." *Ibid.* Although the Authority's action in making the findings and determination required by § 61 is

properly neither "adjudicatory" nor "regulatory,"[40] in terms of the purposes to be served by judicial review it is much closer to the latter. Adjudicatory actions are often "quasi judicial decisions involving particular persons" (*ibid.*),[41] wherein a reviewing court has the strongest interest in seeing that justice was done for each individual whose "substantial rights" may be prejudiced by such decisions. See *Salisbury Water Supply Co.* v. *Department of Pub. Util.* 344 Mass. 716, 718 (1962). The decisions required by § 61 clearly are not of this sort. Determinations as to impact on the environment made by a public body under § 61 usually would not directly affect the rights of private parties. Such determinations, then, are not of the type as to which a reviewing court "should search the factual and legal basis" or require "an explanatory statement which . . . [it] can examine and criticise." *Cambridge Elec. Light Co.* v. *Department of Pub. Util., supra,* at 490.

The plaintiff relies on the opinion in *West Broadway Task Force, Inc.* v. *Commissioner of the Dept. of Community Affairs,* 363 Mass. 745 (1973). That case was similar to the present one in that the administrative action challenged, namely, the operation of a housing project by the Boston housing authority under the supervision of the Department of Community Affairs, was neither regulatory nor adjudicatory. The only statutory basis for judicial review was a general policy statement contained in G. L. c. 121B, § 32, that "each housing authority shall manage and operate decent, safe and sanitary dwelling accommodations." We characterized that case as resembling "those . . . situations

---

[40]The State Administrative Procedure Act, G. L. c. 30A, thus has no application to this action. For discussion of the distinctions between adjudicatory and regulatory administrative actions, see *Milligan* v. *Board of Registration in Pharmacy,* 348 Mass. 491, 494-498 (1965); *Reid* v. *Acting Commr. of the Dept. of Community Affairs,* 362 Mass. 136, 138-145 (1972).

[41]See also the definition of an "[a]djudicatory proceeding" in G. L. c. 30A, § 1 (1), as a proceeding "in which the legal rights, duties or privileges of specifically named persons are required . . . to be determined."

in which courts have regularly resisted the temptation to substitute their initiative or judgment for that of agencies charged, as the defendant agencies are here charged, with primary responsibility for discretionary choices." *Id.* at 751. But we also noted that: "Courts, however, have been keen to override traditional limitations and scrutinize agency action when health or life was at stake . . . and the present bill unmistakably and properly announces this theme." *Ibid.* Because there were alternative procedures available to achieve satisfactory operation of the housing project, however, we held that the plaintiffs had not presented a proper case for judicial relief. Their right to bring a similar suit in the event the alternative procedures proved ineffective was expressly reserved.

The present plaintiff contends that judicial review of the Authority's compliance with § 61 is appropriate under the exception noted in the *West Broadway* case, because the public health is "at stake" in the control of air pollution. There is no question that decisions made under § 61 could have substantial consequences for "health" and even for "life" (although the relationship between administrative decision and consequence to health is not so immediate here as it was in the situation presented in the *West Broadway* case). But the plaintiff's argument ignores the actual holding of the *West Broadway* case, i.e., that the court would not intervene in the administrative agencies' discretionary decisions until the plaintiffs had exhausted all alternative procedures. The Legislature has provided in § 62 procedures both for compliance with and for enforcement of the requirements of § 61,[42] which procedures certainly constitute an "alternative" to judicial review and thus should be ex-

---

[42] As discussed earlier, all § 61 determinations must be supported by environmental impact reports. Such reports must conform to regulations which· are adopted by the secretaries of the executive offices and approved by the Secretary of Environmental Affairs. Each such report must itself be submitted for review by the Secretary of Environmental Affairs; the secretary is to issue a written statement declaring whether or not each such report is in compliance with § 62.

hausted before judicial review becomes appropriate.[43] If § 61 stood alone our decision on whether administrative action taken pursuant to it is reviewable might be different. Such is not the case, however, and § 61 must be interpreted in light of the provisions of its companion section. This result is consistent with our holding in the *West Broadway* case.

Finally the plaintiff has cited numerous decisions from other jurisdictions, both State and Federal, involving the extent to which reviewing courts may, or must, review administrative interpretations of and compliance with environmental statutes. Several of the cases cited are clearly inapposite in that they involve only the question of when, pursuant to the applicable State or Federal statute, administrative bodies are required to submit environmental impact reports analogous to those required by § 62.[44] No such issue is presented by the case now before us. There is no need for detailed review of the other decisions[45] relied on by the plaintiff. In each case the extent to which administrative compliance with environmental laws is subject to judicial review is largely to be determined from the particular statutory context. No case cited by the plaintiff persuades us that our interpretation of the Massachusetts environmental statutes here under consideration, and especially of the chronology of the effective dates of G. L. c. 30, §§ 61 and 62, is incor-

---

[43]It is, of course, true that the alternative procedures of § 62 are not applicable in the present case, which arose and was decided below prior to the effective date of that section. But, as we have discussed, for us to interpret § 61 as permitting judicial review in this case merely because § 62 was not yet effective would be to ignore the purpose intended by the Legislature when it staggered the effective dates of those sections.

[44]See, e.g., *Lathan* v. *Volpe,* 455 F. 2d 1111 (9th Cir. 1971); *Save Our Ten Acres* v. *Kreger,* 472 F. 2d 463 (5th Cir. 1973); *Silva* v. *Romney,* 473 F. 2d 287 (1st Cir. 1973); *Students Challenging Regulatory Agency Procedures* v. *United States,* 346 F. Supp. 189 (D. D. C. 1972), reversed on other grounds, sub nom. *United States* v. *Students Challenging Regulatory Agency Procedures,* 412 U. S. 669 (1973); *Friends of Mammoth* v. *Board of Supervisors of Mono County,* 8 Cal. 3d 247 (1972).

[45]*Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U. S. 402 (1971). *Calvert Cliffs Coordinating Comm. Inc.* v. *United States Atomic Energy Commn.* 449 F. 2d 1109 (D. C. Cir. 1971). *Environmental Defense Fund, Inc.* v. *Corps of Engineers of the U. S. Army* 470 F. 2d 289 (8th Cir. 1972).

rect. We hold that the decision of the Superior Court judge refusing to permit inquiry into the adequacy of the Authority's compliance with § 61 was correct.

The decree is vacated, and this case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX

Summary of the definition section and of Regulations 1 and 2 of the air pollution control regulations of the Department of Public Health, adopted by the Department on January 26, 1972, and amended on August 8, 1972.

*"DEFINITIONS*

"When used in these regulations or in communications, notices or orders relative thereto, the following words and phrases shall have the meanings ascribed to them below: . . .

"4.   AIR CONTAMINATION SOURCE means any place at or from which any air contaminant is emitted to the ambient air space.

"5.   AIR POLLUTION means the presence in the ambient air space of one or more air contaminants or combinations thereof in such concentrations and of such duration as to:
    a. cause a nuisance;
    b. be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property; or
    c. unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business.

"6.   AMBIENT AIR SPACE means the unconfined space occupied by the atmosphere above the geographical area of the District . . . .

"9.   DEPARTMENT means the Department of Public Health.

"10.   DISTRICT means the Metropolitan Boston Air Pollution Control District (MBAPCD) . . . .

"12.   EMISSION means any discharge or release of an air contaminant to the ambient air space.

"13.   FACILITY means any installation or establishment and equipment associated therewith capable of emissions . . . .

"15.   FOSSIL   FUEL   UTILIZATION   FACILITY   means   any furnace(s), fuel burning equipment, boiler(s), or any appurtenance thereto used for the burning of fossil fuels, for the emission of products of combustion, or in connection with any process which generates heat and may emit products of combustion, but does not mean a motor vehicle . . . .

"19.   FURNACE means any enclosed structure designed to produce heat from the burning of a fuel therein, but does not mean open hearths,

incinerators, stoves for cooking, fireplaces, or equipment for the melting, reclaiming, or refining of metals or maple syrup . . ..

"22. INCINERATOR means any article, machine, equipment, contrivance, structure, or any part of a structure, used primarily for the reduction of combustible wastes by burning . . ..

"23. MAJOR SOURCES for the purposes of Regulation 2.5 is defined as any fossil fuel utilization facility having an energy input capacity rated by the Department as greater than 30,000,000 B.t.u.'s per hour; any incinerator having a charging rate greater than 1000 lbs. per hour, an asphalt batching plant, ferrous or non-ferrous foundry, or aggregate manufacturing or processing plant.

"24. MOTOR VEHICLE means any equipment or mechanical device propelled primarily on land by power other than muscular power but does not mean railroad and railway engines and cars, vehicles operated by the system known as trolley motor or trackless trolley, or devices used for domestic purposes . . ..

"32. PERSON means any individual, partnership, association, firm, syndicate, company, trust, corporation, department, authority, bureau, agency, political subdivision of the Commonwealth, law enforcement agency, fire fighting agency, or any other entity recognized by law as the subject of rights and duties.''

*"REGULATION 1. General Regulations to Prevent Air Pollution*

"1.1 No person owning, leasing, or controlling the operation of any air contamination source shall willfully, negligently, or through failure to provide necessary equipment or to take necessary precautions permit any emission from said air contamination source or sources of such quantities of air contaminants which will cause, by themselves or in conjunction with other air contaminants, a condition of air pollution.

*"REGULATION 2. Plans Approval and Emission Limitations*

"2.1   *General*

2.1.1 No person shall construct, substantially reconstruct or alter any facility regulated herein that may cause or contribute to a condition of air pollution unless the plans, specifications, proposed Standard Operating Procedure, and the Proposed Maintenance Procedure for such facility have been submitted to the Department for approval and approval has been granted in writing.

(a) Application for approval to construct, substantially reconstruct, or alter any facility shall be made on forms furnished by the Department, or by other means prescribed by the Department.

(b) Each application shall be signed by the applicant.

(c) Each application shall be accompanied by site information, plans, descriptions, specifications, and drawings showing the design of the facility, the nature and amount of emissions, and the manner in which it will be operated and controlled.

(d) Any additional information, plans, specifications, evidence of documentation that the Department may require shall be furnished upon request.

(e) All plans and specifications submitted to the Department shall bear the seal and signature of a professional engineer registered in the Commonwealth under the provisions of Chapter 112 of the General Laws as amended. Such approval shall not affect the responsibility of the owner or operator to comply with other applicable regulations.

"2.1.2.   No approval will be issued in instances where:

(a) emissions from such a facility would result in air quality exceeding the Massachusetts or National Ambient Air Quality Standards, or

(b) emissions from such facility would exceed the applicable regulatory emission limitations as specified in Regulation 2.5, or

(c) emissions from such a facility would result in violation of the provisions of any of these Regulations.

"2.1.3.   The Department will act within 60 days on an application and will notify the applicant in writing of its approval, conditional approval, or denial of the application. The Department will set forth its reasons for any denial. The Department may impose any reasonable condition upon an approval including conditions requiring the facility to be provided with:

(a) Sampling ports of a size, number, and location as the Department may require,

(b) Safe access to each port,

(c) Instrumentation to monitor and record emission data, and

(d) Any other sampling and testing facility.

"2.1.4.   The Department may cancel an approval if the construction is not begun within 2 years from the date of issuance, or if during the construction, work is suspended for 1 year.

"2.2   *Department Participation*

The Department in its evaluation for approval of the design for construction, reconstruction, alteration, the Standard Operating Procedure and proposed maintenance procedure for any facility will limit itself to consideration of such matters which, in its opinion may cause or contribute to a condition of air pollution. The Department will consult upon request concerning design criteria and design of any facility prior to submittal of plans.

"2.3   *Application*

Regulation 2, in its entirety, shall apply to fossil fuel utilization facilities having energy input capacities greater than three million (3,000,000) B.t.u. per hour; incinerators; industrial facilities, such as asphalt batching plants, foundries, chemical products manufacturing plants, petroleum products manufacturing plants, aggregate manufacturing plants, food and food products plants, wood products plants, dry cleaning establishments, paint and varnish manufacturing plants, paper manufacturing plants, leather manufacturing plants, concrete manufacturing plants, and metal coating and treating plants, and such other facilities as the Department may require.

"2.4   *Criteria of Application*

When, in the opinion of the Department, any facility has a likelihood of causing or contributing to a condition of air pollution, the person owning, leasing, or controlling the operation of the facility shall, upon

request by the Department, submit to the Department, plans, specifications, Standard Operating Procedure, maintenance procedure and such other information as may be necessary to determine the adequacy of application in said facility of air pollution control technology. If, after review of said information, the Department determines that the facility is in need of reconstruction, alteration, or repair to prevent it from causing or contributing to a condition of air pollution said facility may be temporarily continued in operation pending such reconstruction or repair if the person owning, leasing, or controlling the operation of the facility

(a) demonstrates to the satisfaction of the Department hardship or public need and

(b) agrees to submit plans and specifications for reconstruction, alteration, or repair of the facility and proposed Standard Operating Procedure for the reconstructed or altered facility to the Department within an agreed-upon reasonable period of time for the Department's review and approval prior to the intended reconstruction, alteration, or repair and subsequent operation and

(c) indicates his intention to reconstruct, alter, or repair and thereafter to operate the facility in accordance with the plans, specifications, Standard Operating Procedure and maintenance procedure. as approved by the Department after submittal.

"2.5   *Compliance with Emission Limitations*

2.5.0. Persons owning, leasing, or controlling the operation of any facility described in Regulation 2.3 (field of application) shall achieve full compliance, by January 31, 1974, with the regulatory emission limitation applicable to such facility or take the actions shown below:

(a) justify to the Department that additional time is needed and

(b) submit a proposed plan and compliance schedule for said facility to the Department not later than December 31, 1972.

Justifications for additional time to comply with regulatory emission limitations, and the submittal of proposed plans and compliance schedules are subject to review and approval by the Department and must provide for compliance with applicable regulatory emission limitations as expeditiously as practicable, but in no case later than July 31, 1975. All compliance schedules shall provide for periodic increments of progress including submittal of engineering plans, ordering of equipment after plan approval, installation date after confirmation of order by the manufacturer and the date by which the applicable regulatory emission limitation will be achieved after equipment is in satisfactory operation."

[The remainder of Regulation 2 contains specific emissions limitations applicable to specific types of facilities.]