SECRETARY OF ENVIRONMENTAL AFFAIRS & another *vs.*
MASSACHUSETTS PORT AUTHORITY & another
(and a companion case[1]).

Suffolk.    December 6, 1974. — February 5, 1975.

Present: TAURO, C.J., REARDON, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Massachusetts Port Authority.    Airport.    Environmental Affairs.
Administrative Agency.    Jurisdiction,* Damage to the environment,
Judicial review of administrative action.

Statement of principles governing the necessity of preparation and filing
    of environmental impact reports by State agencies under G. L. c. 30,
    § 62.  [760-762]
Notwithstanding the fact that the defendant, Massachusetts Port
    Authority, had in May of 1969 admittedly commenced landfill, dike
    and drain construction, and surcharging in preparation for a disputed
    runway project prior to the effective date of G. L. c. 30, § 62,
    where there was ample evidence that none of these steps constituted a
    binding commitment to build runways, there was no error in the
    conclusion that the runway project did not "commence" within the
    meaning of § 62, and regulation 13 of the Executive Office of
    Environmental Affairs until after the effective date of § 62, thus
    making the selection applicable to the project. [762-767]
An environmental impact report under G. L. c. 30, § 62, is required prior
    to commencement of a project whenever there is a potential for
    damage to the environment which may be characterized as not
    insignificant. [768-770]
In reviewing an agency's decision that a proposed project would not
    adversely affect the environment and that an environmental impact
    report under G. L. c. 30, § 62, was not required, the trial judge was not
    limited to determining whether the agency's decision was arbitrary or
    capricious but could properly make his own findings of fact. [770-773]
When viewed in conjunction with the minimal threshold standard of
    environmental damage which will require the preparation of an
    environmental impact report under G. L. c. 30, § 62, the general
    findings of the judge that some residential areas might suffer from
    significant noise exposure were sufficient to support a finding that the

---

[1] City of Boston & others *vs.* Massachusetts Port Authority & another.

runway project may cause environmental damage within the meaning of § 62. [773-778]

Where an agency was required by G. L. c. 30, § 62, to publish an environmental impact report before commencing a project, determination of the agency's compliance with c. 30, § 61, requiring use of all means to minimize damage to the environment resulting from a project, could be made only after the filing of the report. [778]

BILL IN EQUITY filed in the Superior Court on May 24, 1974.

The suit was heard by *Mason, J.*

CIVIL ACTION commenced in the Superior Court on July 17, 1974.

The case was heard by *Mason, J.*

*John S. Hopkins, III (John D. O'Reilly, III, Paul B. Galvani & John H. Mason* with him) for Massachusetts Port Authority & another.

*Peter L. Koff,* Assistant Corporation Counsel, *& Daniel D. Sullivan (Herbert P. Gleason,* Corporation Counsel, with them) for the city of Boston & interveners.

*Gregor I. McGregor,* Assistant Attorney General, for the Secretary of Environmental Affairs & another.

REARDON, J.   The matter before us is a consolidated appeal from two amended judgments entered in the Superior Court in Suffolk County on September 13, 1974. In one case the city of Boston had sought declaratory and injunctive relief for alleged violation of the Massachusetts Environmental Policy Act (MEPA), G. L. c. 30, §§ 61 and 62 (inserted by St. 1972, c. 781, § 2), by the Massachusetts Port Authority (Massport) and by the Perini Corporation (Perini) in connection with the extension of two runways and the construction of another at the General Edward Lawrence Logan International Airport (Logan). In the case brought by the city of Boston, various interveners were admitted to join the plaintiffs. In the second case, the Secretary of Environmental Affairs (the Executive Office of Environmental Affairs is hereinafter referred to as EOEA), and the Secretary of Transportation and Construction (the Executive Office of Transportation and Construction is hereinafter referred to as EOTC), sought

substantially the same relief against the same defendants as in the case brought by the city of Boston. Following hearing the trial judge made findings, rulings and orders for judgment, and judgments were entered enjoining the defendants "from any further construction of the Runways Project at Logan until the Massachusetts Port Authority has published a final environmental impact report and otherwise complied with the provisions of G. L. c. 30, §§ 61 and 62." On motions of the defendants, the judgments were amended to permit certain work to be done to secure the project over the winter and for safety reasons.

The issues of the appeal may be simply stated:

1. Was the trial judge correct in his conclusion that the runways project did not "commence" within the meaning of G. L. c. 30, § 62, until the execution of a contract between Massport and Perini for construction of runway extensions and a new runway in May, 1974, after the effective date of § 62?

2. Was the trial judge correct in his findings that the extension of two major runways and the addition of a new general aviation runway at Logan may cause environmental damage within the meaning of G. L. c. 30, § 62?

3. Is there a conclusive showing on the record that Massport has in fact complied with G. L. c. 30, § 61, with respect to the runways project?

Pertinent issues subsidiary to the three stated above will also be treated in this opinion.


## I.  DATE OF COMMENCEMENT.


*A. Factual Background.*

A proper understanding of the issues requires a chronology of events which we construct in part from the judge's findings and by reference to other matters in the records and the parties' briefs. There is no real dispute on the facts. The chronology is as follows.

1. *1959.*  Massport began acquiring title to Bird Island Flats, a tidal flat on the south shoreline of the airport, and a

master plan was drawn up outlining potential uses for the area. This plan included a proposal to extend runway 4L into the Bird Island Flats area.

2. *1964.* The Massport board authorized contracts for fill for this area.

3. *1966.* The Massport board authorized a contract for a feasibility study on the development of the Bird Island Flats area.

4. *1967.* An Airport Layout Plan showed a proposed extension of runway 9 into the Bird Island Flats area. Extension of runway 4L, as proposed in the 1959 plan, was not included in this plan.

5. *1968.* Massport authorized a contract for preparation of construction plans and specifications for the development of Bird Island Flats, to include an interceptor drain and rock dike encompassing the entire Bird Island Flats area (some 234 acres). According to the 1967 Airport Layout Plan, portions of the area were designated for future cargo and fuel storage and for airline hangars, in addition to the proposed runway 9 extension.

6. *April 10, 1969.* Massport awarded contracts for construction of the interceptor drain and the rock dike. This construction was completed in August, 1971.

That same day Massport authorized a bond issue, in part to pay for the interceptor drain and rock dike. No mention was made in the prospectus of runway extension apart from a reference to the drain and dike construction as permitting "expansion of the airport to the south."

7. *May, 1969.* Construction work began on the dike and interceptor drain. Massport subsequently cited this date as the date of commencement.

8. *February, 1970.* The Federal Aviation Administration approved Massport's 1970 Airport Layout Plan. This was the first plan which included extensions of both runways 4L and 9, and the first description of the proposed construction of a short takeoff and landing (STOL) runway. The present proposal, however, is to extend runway 9

approximately 400 feet farther than as shown in the 1970 plan, and to extend the STOL runway approximately 1,400 feet farther than as shown. The alignment of the STOL runway as presently contemplated is also slightly different.

9. *October 5, 1971.* The Massport board authorized a second bond issue, in part for additional financing of the runways project. The prospectus referred to proposed extensions of runways 4L and 9 in the dimensions described in the 1970 Airport Layout Plan.

10. *February, 1972.* The Massport board authorized a fill contract with The Barletta Co. Inc. (Barletta) which included provision for surcharging the area of the proposed runway extensions and the STOL runway, that is, piling gravel on the fill to cause complete settlement of the fill, thus giving the land the capability to support runways.

11. *January 30, 1973.* The Massport chairman gave notice of a public hearing on the runways project. The notice referred to extensions of runways 4L and 9 and construction of a STOL runway as staff suggestions, and stated:

"The Authority has neither approved nor disapproved the proposed improvements. It will not act until it has heard every comment which the public wishes to make at the hearing. The testimony presented at the hearing, together with other information, will be considered by the Authority before it decides whether to approve all, some or none of the suggested construction. . . . The public hearing is the primary opportunity for the public to comment on the proposed airport improvements. We consider it essential that the hearing occur early enough in the review process to affect the decisions ultimately made by the Authority."

12. *April 12, 1973.* The Massport board authorized another bond issue, part of which was to be used to complete the filling of the Bird Island Flats area. The prospectus referred to runway 9 as being extended by 1,400 feet (as in the 1970 Airport Layout Plan) but noted that it might be extended by 1,800 feet instead.

13. *July 1, 1973.* Effective date of G. L. c. 30, § 62.

14. *July 26, 1973.* A contract was executed by Massport for engineering services, including "[p]reparation ... of preliminary designs and drawings with supporting estimates of sufficient detail to define the construction required."

15. *May 16, 1974.* The Massport board authorized execution of a contract with Perini for extension of runways 4L and 9 and construction of the STOL runway. This contract was executed on May 17, 1974, and Perini commenced work on May 23, 1974. The contract calls for extension of runway 4L by 1,896 feet, extension of runway 9 by 1,789 feet, and construction of a 3,830 foot STOL runway, together with taxiways, lighting, and drainage work. The contract includes excavation, grading, laying of pavement, and electrical work.

The contract with Perini makes provision for settlement in the event that for any reason the work contracted for is not completed.

B. *Statutory Background.*

Under G. L. c. 30, § 61, State agencies are required to evaluate the environmental impact of any projects undertaken and to use "all practicable means and measures to minimize damage to the environment." Further, "[u]nless a clear contrary intent is manifested, all statutes shall be interpreted and administered so as to minimize and prevent damage to the environment."

The operative section of MEPA is G. L. c. 30, § 62, providing for an environmental impact report (EIR) to describe the environmental impact of proposed projects, measures being utilized to minimize environmental damage, any adverse short term or long term consequences which cannot be avoided, and alternatives to the proposed action. The key provision applicable to this case is the first paragraph of § 62: "No ... authority of the commonwealth ... shall commence any work, project, or activity which may cause damage to the environment until sixty days after it has published a final environmental impact report in accordance with the provision of this section or until sixty days after a public hearing on said report, provided

that research, planning, design and other preliminary work necessary to describe and evaluate such project for the purposes of this section may be undertaken."

Of preëminent importance in viewing the statutory scheme is the requirement that a *final* EIR be filed sixty days before the commencement of a project. Section 62 contemplates both a draft EIR and a final EIR, and specific references to the two documents are made throughout § 62. Preparation of the draft EIR is to be commenced "during the initial planning and design phase of any work, project, or activity subject to this section." G. L. c. 30, § 62. The draft EIR is then circulated for comment to various entities, including EOEA, and to the public. Upon receipt of comments, the agency then prepares a final EIR. Under a 1974 amendment to § 62 of MEPA,[2] legal proceedings alleging that the final EIR fails to comply with the statute must ordinarily be commenced within thirty days after the final EIR has been transmitted to the Secretary of EOEA, and proceedings alleging the impropriety of an agency's determination that it has complied with the § 61 mandate to minimize damage to the environment must be brought within sixty days after the date when the Secretary issues his comment on the final EIR or not later than ninety days after he is sent the final EIR, whichever date occurs first.

In addition to the foregoing, the final EIR plays another important role. As described by this court in *Boston* v. *Massachusetts Port Authy.* 364 Mass. 639, 659-660 (1974), it is the final EIR which provides the data on which the § 61 decision (whether the project in fact minimizes damage to the environment) is to be based and against which that decision is to be evaluated by a reviewing court. If no final EIR is required in a given case, judicial review of the agency's decision that § 61 has been complied with must be minimal. In this instance we have no doubt that § 61 applies to Massport, the question being only whether § 62 also applies. This is so because the effective dates of §§ 61 and 62 were staggered. Section 61 took effect on December 31, 1972, while § 62 did not become effective until July 1,

[2] St. 1974, c. 257, § 2.

1973. St. 1972, c. 781, § 3. Thus if this project commenced prior to July 1, 1973, § 62 is inapplicable and no EIR is required. *Boston* v. *Massachusetts Port Authy., supra,* at 660-661.

C. *Regulations under the Statute.*

Section 62 provides that "[t]he secretaries of the executive offices shall each promulgate rules and regulations approved by the secretary of environmental affairs to carry out the purposes of this section which shall be applicable to all agencies, departments, boards, commissions, authorities or instrumentalities within each of such executive offices and which shall conform with the requirements of the National Environmental Policy Act Pub. Law 91-190, and amendments thereto." Pursuant to that authority, the Secretary of EOEA on July 6, 1973, published "Regulations to Create a Uniform System for the Preparation of Environmental Impact Reports." Regulation 13 deals with the retroactivity of § 62, and provides that "[p]rojects shall be deemed to have commenced when the agency has undertaken a continuous program of action or construction or has entered into a binding agreement or other obligation to undertake and complete a continuous program of action or construction." The regulation also provides that the secretaries of the executive offices shall, with the approval of the Secretary of EOEA, further define the word "commenced" by regulations. Such regulations "shall specifically identify a uniform phase or point, the completion or attainment of which commits the agency to the ultimate completion of a specifically planned activity." EOEA Reg. 13.

D. *Commencement of the Runways Project.*

The trial judge concluded on the basis of the regulations and the language of § 62 that the runways project did not commence until Massport entered into a binding agreement in its May 17, 1974, contract with Perini to construct the runway extensions and the STOL runway. Since this date is after the effective date of § 62, the judge held that the EIR requirements were applicable.

Massport's principal argument is that the judge misinterpreted EOEA Reg. 13.[3] It is argued that the landfill operations, the dike and drain construction, and the surcharging qualify under the phrase "undertaken a continuous program of action or construction." But the EOEA contends that the applicable phrase is the second one: "entered into a binding agreement . . . to undertake and complete a continuous program of action or construction." This interpretation would apply the first phrase only to activities undertaken by employees of the agency, where there would be no contractual obligation to carry through on the project. Even were we to apply the first phrase, however, we do not believe its purpose was to exempt all projects which might be related to some construction which took place prior to the effective date of § 62 and thereby deemed part of a "continuous program." From the point of view of Massport, what is necessary here is the existence of a commitment entered into prior to July 1, 1973, which is irreversible in nature, and which has a clearly defined objective. We fail to find on what is before us that Massport had entered into such a commitment, perhaps best described in EOEA Reg. 13 as the point at which the agency is bound to "the ultimate completion of a specifically planned activity."

We describe further what leads us to our conclusion. From the record it is evident that a number of construction contracts were entered into at various times, going back into the early 1960's. In a sense there has been a continuous program since Massport began acquiring title to the Bird

---

[3] Massport's argument is not helped by reference to the regulations promulgated under the authority of § 62 by the Secretary of EOTC. These regulations govern Massport, which is an authority within the EOTC according to G. L. c. 6A, § 19. Regulation 13.2 deals with the retroactivity question, and provides in part: "In cases where an agency is unsure whether a report should be prepared, the agency shall seek the advice and concurrence of the Secretary." Regulation 13.3 then follows, listing ten factors which "the agencies and the secretary shall consider" in determining whether a given activity has commenced for § 62 purposes. There is no allegation that the advice and concurrence of the Secretary of EOTC with respect to the time of commencement of the project were ever sought; indeed, the Secretary was of the express opinion that the project had not commenced until after the effective date of § 62 and, in fact, is also a plaintiff in this action.

Island Flats in 1959 to expand the airport to the south. Given the nature of an airport, construction of runways would almost certainly be a part of that program. Massport focuses on May, 1969, when construction of the dike and the interceptor drain began, as the critical date. However, the work was simply part of the entire filling operation of Bird Island Flats, a 234 acre area, only a portion of which is to be used for runways. According to the various layout plans, other portions of the area enclosed by the dike are proposed to be used for fuel storage, airline hangars, cargo storage, aprons, and taxiways. Moreover, at the time of commencement of this work, the only runway extension proposal appearing on the then current Airport Layout Plan was an extension of runway 9. Since the nature of the environmental impact depends on the length of runway extensions and on which runways are to be extended or constructed, it would make no sense to interpret the statute in such a way as to deem the project to have commenced at this time. It is to be remembered that the decision as to when a project commences determines not only whether § 62 is inapplicable because of the retroactivity question, but also when in a post-July 1, 1973, situation the final EIR must be published, since a project cannot be commenced until sixty days after the publication of the final EIR. To say that the proper timing for a final EIR would have been sixty days prior to commencing work on the dike and the drain would obviously make little sense in terms of the statutory scheme.

A more plausible possibility for the date of commencement is the time of execution of the fill contract with Barletta in February, 1972, since that contract included provisions for surcharging the area of the proposed runways. Unlike the dike and drain contracts, there was no justification for the surcharge aspect of the contract other than an intent to build runways in that area at some time.

However, the following considerations apply to that contract. First, in so far as the regulations are to be relied on, it is evident that the surcharging contract did not actually commit Massport to construct the runways, and

the judge so found. Surcharging is in fact simply an aspect of landfill operations in which additional materials are piled several feet above grade to compress the fill and increase its support capability. After the surcharging was completed, the resulting situation closely resembled what it would be if Massport had instead purchased dry adjacent land for contemplated future runway construction. An EIR generally would not be required prior to mere land acquisition. See *United States* v. *Three Tracts of Land,* 377 F. Supp. 631, 637-638 (N. D. Ala. 1974).

Second, although the surcharging was clearly related to runway construction, the fact is that at the time of surcharging Massport had reached no final decision on the length of its proposed extension of runway 9. This appears from its 1973 bond issue statement, in which the proposed extension was listed as 1,400 feet, though it "may be extended approximately an additional 400 feet." Under the present proposal, the extension would be approximately 1,800 feet. That the decision had not been made in 1972 is important, for the precise length of extensions directly affects the potential environmental impact by determining the possible altitude of planes approaching and leaving the airport.

Finally, and most persuasively, a finding that the project commenced with the surcharge contract would ignore the significant events that followed. As set out in the chronology, in January, 1973, the chairman of Massport, in an official public notice, stated that "[t]he Authority has neither approved nor disapproved the proposed improvements. . . . The testimony presented at the hearing, together with other information, will be considered by the Authority before it decides whether to approve all, some or none of the suggested construction." To say that Massport had commenced construction of the runways in February, 1972, would be to make a sham of this statement and the public hearing which followed. Certainly it could not be said that prior to this date Massport had committed itself to extending either runway or constructing the STOL runway, or had even made a decision on the question. Nor

would it make sense to say that at some earlier time Massport should have filed a final EIR. We have already indicated that the final EIR contains the findings and conclusions of an agency that a specific project should get under way in a defined manner so as to minimize environmental impact. After publication of the final EIR, the EOEA and the public have their last chance to comment and bring legal proceedings if thought necessary. The final EIR becomes then the vehicle for review by the court in evaluating the agency's determination that the project, as designed, represents the best accommodation with the environment. *Boston* v. *Massachusetts Port Authy.* 364 Mass. 639, 660 (1974).

We are confirmed in our analysis of what occurred by reference to the next chronological event. In June, 1973, the Massport board authorized a contract with an engineering firm for, among other things, "[p]reparation . . . of preliminary designs and drawings." Thus, the runway extensions and construction of the STOL runway were still in the planning and design phase. The language of § 62 makes clear that "commencement" does not include this sort of preliminary work. This contract was not executed by Massport until July 26, 1973, after the effective date of § 62.[4] Not until May 17, 1974, was a contract finally executed to provide for excavation, grading, and the laying of pavement for the runways.

In sum, the issue of when the project commenced must be considered in the context of the statutory scheme. We emphasize that the date of commencement affects only the latest time when a *final* EIR can be filed. The statute expressly provides, as we have indicated, that preparation of a draft EIR is to be commenced during the initial planning and design phase. G. L. c. 30, § 62. See EOEA Regs. 7.1-7.10. The interpretation for which Massport has

---

[4] *Elliot* v. *Volpe,* 328 F. Supp. 831, 834-835 (D. Mass. 1971), cited to us by Massport, is of no particular help to the agency since in that case all planning and design had been completed, a construction contract executed, and further undertakings had been under way at the time of the effective date of the National Environmental Policy Act of 1969 (NEPA), 42 U. S. C. §§ 4321-4347 (1970).

vigorously argued would require a final EIR at such an early stage that the agency could not possibly accord full consideration to the ultimate environmental impact of a given proposal. Its interpretation would also have the effect of exempting many long range activities of State agencies from the requirement of filing EIR's on a large number of projects which could be viewed as commenced years ago. To yield to such an interpretation would be to weaken greatly, if not to destroy, the thrust and objective of MEPA. We cannot accord the statute this interpretation in light of the legislative intent evident in its terms. The line must be drawn somewhere and it is quite obvious that the proper place to draw it in this case is well after the effective date of § 62. If it be argued that there is certain harshness in the retroactive application of the statute, this was surely taken care of by the Legislature's decision to delay the effective date of § 62 from July 18, 1972, when the statute was enacted, to July 1, 1973. St. 1972, c. 781, § 3.

Thus, on this phase of the case we consider the judge's views and action to have been right.

## II.  REQUIREMENT OF ENVIRONMENTAL IMPACT REPORT.

A. *Background.*

Under the express authority of G. L. c. 30, § 62, the secretaries of EOEA and EOTC promulgated regulations defining procedures to be followed in connection with the preparation of EIR's. Under the EOTC regulations, the first step is the preparation of an environmental assessment form by means of which the agency reports its recommendation on whether a proposed activity will require an EIR. EOTC Reg. 3.1 (a). If the agency concludes that no EIR is required, the assessment form must contain a description of how that conclusion was reached. The Secretary of EOTC may seek from the agency a reëvaluation of its position if he deems it necessary. EOTC Reg. 3.1 (c). In due course such an assessment form (termed a "negative assessment") is eventually routed to EOEA, carrying such comment from the Secretary of EOTC as he

may wish to make. EOTC Reg. 3.1 (a). The submitting agency is required to give public notice of the transmittal of a negative assessment, and within a specified time the Secretary of EOEA must issue a written statement indicating whether or not in his judgment the negative assessment properly complies with the law. EOTC Reg. 3.2 (b) and (c). EOEA Reg. 3.2 (b) and (c).

On May 16, 1974, the Massport board adopted a formal vote that, based on a 1972 Preliminary Environmental Impact Report prepared for Federal purposes and on staff studies, it had found that the runways project would have "no overall adverse environmental impact." On May 18, 1974, Massport submitted an environmental assessment form to the Secretary of EOTC, checking the box which states: "It has been determined that the project will not cause significant environmental damage. No further reports will be filed." This form was forwarded to EOEA on May 24, 1974, with the recommendation of EOTC that the negative assessment be approved. Subsequently public comment was received by EOEA which, the trial judge found, "reflected considerable controversy on environmental grounds."

On July 1, 1974, the Secretary of EOEA issued a statement that the negative assessment was not in compliance with § 62 and the regulations, and concluded that, since the project might cause damage to the environment, preparation of an EIR was required. The judge agreed with the Secretary and has enjoined construction of the runways project until a final EIR has been published pursuant to § 62.

B. *The Legal Standard.*

Under § 62, an EIR must be published before commencement of any project "which may cause damage to the environment." As defined in § 61, "damage to the environment" includes "actual or probable" damage but excludes "any insignificant damage." Based on this definition, and because the statute requires only that there "may" be such damage, the judge concluded that "the threshold of poten-

tial environmental damage to warrant an impact statement under MEPA is minimal." This interpretation seems quite proper. The EIR is the key to the entire statutory scheme; without it there is little assurance that the agency will give any consideration to the environment, and the agency's decision to proceed with a project may escape any judicial review. *Boston* v. *Massachusetts Port. Authy.* 364 Mass. 639, 660-661 (1974). That the Legislature did not intend this provision to be narrowly construed is supported by the statement in § 61 that "[u]nless a clear contrary intent is manifested, all statutes shall be interpreted and administered so as to minimize and prevent damage to the environment." Thus it is evident that an EIR is required whenever there is a potential for damage to the environment which may be characterized as "not ... insignificant."

Other jurisdictions have adopted a similarly minimal threshold standard. The Federal statute, NEPA, requires an impact statement for "major Federal actions significantly affecting the quality of the human environment." 42 U. S. C. § 4332 (2) (C) (1970). This language appears on its face stricter than that in MEPA, yet Federal courts have gone so far as to impose the requirement of an impact statement as long as the project will "arguably" damage the environment. *Students Challenging Regulatory Agency Procedures* v. *United States,* 346 F. Supp. 189, 201 (D. C. Cir. 1972), revd. on other grounds, 412 U. S. 669 (1973). In California, where the statutory language parallels ours, the California Supreme Court recently adopted a "low threshold" to require an impact statement in "close and doubtful cases." *No Oil, Inc.* v. *Los Angeles,* 13 Cal. 3d 68, 84 (1974). Further, the court concluded that "the existence of serious public controversy concerning the environmental effect of a project in itself indicates that preparation of an EIR is desirable." *Id.* at 85-86. The rationale is that requiring an EIR in such circumstances serves the purpose of "[demonstrating] to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." *Id.* at 86. This theory also appears in the guidelines of the Council on

Environmental Quality, 40 C. F. R. 1500.6 (a), and has been adopted in a number of Federal courts. See *Hanley* v. *Kleindienst,* 471 F. 2d 823, 830 (2d Cir. 1972), cert. den. 412 U. S. 908 (1973); *Nolop* v. *Volpe,* 333 F. Supp. 1364 (D. S. D. 1971); *Silva* v. *Romney,* 342 F. Supp. 783 (D. Mass. 1972), vacated on other grounds, 473 F. 2d 287 (1st Cir. 1973).

Further support for a low threshold test in Massachusetts lies in the existence of EOTC regulations establishing categorical exemptions for each agency under its authority. EOTC Reg. 8, and Appendix C. The exemptions for typical activities unlikely to damage the environment mitigate any concern that too low a threshold requirement will over-burden the agencies with unnecessary paper work and delay.

We note that Massport does not appear to contest the formulation of the legal standard but rather contends that its own determination that the runways project would not adversely effect the environment should be reviewed under the traditional limits of judicial scrutiny applied to find-ings of an administrative agency. If Massport employed an improper threshold test, it would follow that the review would be that of a question of law and no such limits would exist. Based only on the Massport board's vote, it is difficult to say what test was used, and Massport argues here that no damage in fact has been shown. We thus look to see whether the judge applied the correct standard of review of factual questions.

### C. *Scope of Review of Massport Determination.*

Massport's first argument is that the judge treated the letter of July 1, 1974, of the Secretary of EOEA as an "administrative determination" that an EIR was required. On the contrary, however, it is apparent that the judge made his own findings on the basis of "[v]oluminous testimony" by expert witnesses, numerous exhibits in-cluding Massport's Preliminary Environmental Impact Report, and the Secretary's letter.[5]

---

[5] In referring to the Secretary's letter, the judge stated: "Although the opinion of the Secretary of Environmental Affairs is in no way binding, due weight is to be

Massport argues secondly that the trial judge was in error in not treating its decision not to file an EIR as an agency determination subject only to limited review, that is, examination only of whether the determination was not supported by substantial evidence or was arbitrary and capricious.

As a preliminary matter, it should be noted that the State Administrative Procedure Act, G. L. c. 30A, is not applicable to Massport's determination. The decision not to file an EIR is neither "adjudicatory" nor "regulatory" within the meaning of the act, so that the statutory limits on judicial review defined in the act have no bearing. *Boston* v. *Massachusetts Port Authy.* 364 Mass. 639, 662 n. 40 (1974).

The scope of review undertaken by the trial judge was not limited to whether Massport's determination was arbitrary or capricious but rather was based on the statement in *West Broadway Task Force, Inc.* v. *Commissioner of the Dept. of Community Affairs,* 363 Mass. 745, 752 (1973), that "[c]ourts . . . have been keen to override traditional limitations and scrutinize agency action when health or life was at stake." This theory of judicial review was reaffirmed in *Boston* v. *Massachusetts Port Authy., supra,* at 663 (1974), although the court there, as in the *West Broadway* case, refused to engage in that level of review where alternative, nonjudicial remedies remained available to the plaintiffs.

We view as correct the action of the judge in relying on the *West Broadway* case and not limiting the scope of review to that engaged in for ordinary administrative actions. First, there is no doubt that "health" or "life" is at stake here. *Boston* v. *Massachusetts Port Authy.* at 663. Second, the judge correctly found that there were no administrative remedies which had not been exhausted by the plaintiffs. This follows from *Boston* v. *Massachusetts*

given to the environmental expertise of his office." This is not the language of a judge reviewing an administrative finding. Massport's brief goes into great detail on the legislative history of § 62 to show that the Legislature did not intend to give the EOEA the power to require an agency to file an EIR. Massport's reading of the legislative history may well be correct but not even EOEA asserts here that the Secretary has the power to require an agency to file an EIR.

*Port Authy., supra,* where the administrative alternative discussed was preparation of an EIR, the very remedy requested here.

In our opinion the nature of the review undertaken by the judge was appropriate. We consider this an even stronger case for review than *Boston* v. *Massachusetts Port Authy.* In that case there was at least some element of policymaking discretion confided to the agency, while here the decision whether to prepare an EIR can hardly be said to have been committed to agency discretion. Rather, the question is simply whether the agency itself has complied with the requirements of the statute. *Gifford* v. *Commissioner of Pub. Health,* 328 Mass. 608, 616-617 (1952). *Fred C. McClean Heating Supplies, Inc.* v. *Westfield Trade High Sch. Bldg. Comm. of Westfield,* 345 Mass. 267, 269 (1962).

It would appear that § 62 was enacted among other reasons because agencies were not felt to be giving sufficient consideration to environmental concerns. Consequently, when an agency makes a decision downplaying the environmental effects of a proposed activity, the court may properly "cock a skeptical eye" at that decision. Leventhal, Environmental Decisionmaking and the Role of the Courts, 122 U. of Pa. L. Rev. 509, 523-524 (1974). Anderson, NEPA in the Courts, 104-105 (1973). *Hanly* v. *Kleindienst,* 471 F. 2d 823, 838 (2d Cir. 1972) (Friendly, C.J., dissenting), cert. den. 412 U. S. 908 (1973).[6]

Any concern for possible uncertainty on the part of agencies as to whether they can act on their threshold determinations without later being reversed in court is minimal. As mentioned earlier, EOTC Reg. 8 provides for the establishment of categorical exemptions from EIR's for

---

[6] The cases under NEPA support this approach. The prevailing tendency of the Federal courts is to exercise de novo review of agency negative statements. Comment, Judicial Review of a NEPA Negative Statement, 53 B. U. L. Rev. 879, 891 (1973). See, e.g., *Save Our Ten Acres* v. *Kreger,* 472 F. 2d 463, 467 (5th Cir. 1973); *Wyoming Outdoor Coordinating Council* v. *Butz,* 484 F. 2d 1244, 1249 (10th Cir. 1973); *Minnesota Pub. Interest Research Group* v. *Butz,* 498 F. 2d 1314, 1320 (8th Cir. 1974); *Natural Resources Defense Council, Inc.* v. *Grant,* 341 F. Supp. 356, 366 (E. D. N. C. 1972); *Kisner* v. *Butz,* 350 F. Supp. 310 (N. D. W. Va. 1972);

each agency within the jurisdiction of EOTC. Exemptions have been defined for Massport; significantly, runway construction is not included. Further, the regulations also provide that agencies may, with the approval of EOEA, establish specific thresholds of adverse environmental impact for specific types of projects. EOTC Reg. 8.2, Class 8. For example, the Bureau of Building Construction has established a threshold exemption from the EIR requirements permitting it to construct new parking spaces not to increase an institution's spaces by more than twenty-five per cent. Massport, by contrast, has not taken advantage of this opportunity.

EOTC's regulation on categorical exemptions is further evidence that the agencies themselves have not been given a range of discretion in the matter of filing an EIR which might insulate them from judicial review. Rather it is the EOTC (and ultimately the EOEA which must approve EOTC regulations under § 62) which the Legislature believed "was in the best position initially to determine which of its activities involved the potential of environmental impact sufficient to bring it within the scope of . . . [ § 62]." *Answer of the Justices,* 364 Mass. 838, 845 (1973).

D. *The Trial Judge's Factual Findings.*

Having concluded that the judge could properly make his own findings of fact and that he applied the correct legal standard to those facts, the remaining issue is whether he could find as a fact that there was a potential damage to the environment in the proposed runways project. The judge stated: "If the landing thresholds and points for beginning of take-off roll are changed on runways 4L and 9 because of

*Wilson* v. *Lynn,* 372 F. Supp. 934, 937 (D. Mass. 1974). These cases operate under somewhat different premises in that it is agreed that the judicial review must be under the Federal Administrative Procedure Act. 5 U. S. C. § 706 (1970). Some courts have applied the arbitrary or capricious standard to the agency's factual findings of no adverse impact, most notably *Hanly* v. *Kleindienst,* 471 F. 2d 823 (2d Cir. 1972), cert. den. 412 U. S. 908 (1973). But the court in the *Hanly* case added a number of procedural requirements to the agency's fact finding process, including public notice and an opportunity for public submission of facts, so a "reviewable environmental record" would be developed. *Id.* at 836. As Chief Judge Friendly noted in dissent, the agency might just as easily (and preferably) devote the same energies to preparing an impact statement. *Id.* at 839-840.

the extensions of runways 4L and 9, and if the STOL/GA addition is also used, I find that while some residential areas adjacent to Logan might benefit from significant reductions in noise exposure, other residential areas might suffer from significant increases in noise exposure." As all parties concede, the scope of review by this court of the judge's findings of fact is limited. This trial was governed by the new Rules of Civil Procedure, which provide that in nonjury cases "[f]indings of fact shall not be set aside unless clearly erroneous." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). In our opinion the judge's findings were not clearly erroneous.

1. *Effect of the Letter of the Secretary of Environmental Affairs.* We have already noted our disagreement with Massport's contention that the judge arrived at his conclusion on environmental damage by erroneously treating the Secretary's letter as an "administrative determination" that an EIR was required. Nor are we impressed by the argument that the Secretary's letter was hearsay and, hence, inadmissible. This letter consists merely of the statement required by the regulations upon submission of a negative assessment form. EOEA Reg. 3.2 (c). EOTC Reg. 3.2 (c). Section 62 expressly requires the executive secretaries to promulgate regulations "to carry out the purposes of this section." Broad authority is thus conferred on the executive offices limited only by the consideration that the regulations do not conflict with the statute. *Scannell* v. *State Ballot Law Commn.* 324 Mass. 494, 501 (1949). *Bureau of Old Age Assistance of Natick* v. *Commissioner of Pub. Welfare,* 326 Mass. 121, 124 (1950). Regulations aimed at assisting in the determination whether certain activities require preparation of impact statements are plainly within the scope of the act. *Answer of the Justices,* 364 Mass. 838, 845 (1973). Under these circumstances, we view the Secretary's comments on a negative assessment as part of the administrative record to be reviewed along with other competent and relevent evidence in connection with an agency decision not to file an EIR.

It may further be considered that the judge could give the Secretary's letter due weight in light of the environmental expertise of the Secretary's office. That expertise derives from the unique role given the Secretary in administering § 62. See *Boston* v. *Massachusetts Port Authy.* 364 Mass. 639, 659, n. 35, 663, n. 42 (1974).[7] It would seem that since the Secretary's letter concluded that the runways project might cause environmental damage, that in itself would suffice to indicate that the judge's finding was not clearly erroneous.

2. *Effect of Memorandum of Understanding.* An expert witness for the plaintiffs testified that extension of runways 4L and 9 could have a significant effect on noise levels in certain locations by changing the landing threshold of incoming planes. For example, as a result of extending 4L, planes could land at a point farther south, meaning that planes would be at lower altitudes over South Boston during approaches to the extended 4L. There was also testimony of potential noise impact resulting from construction of the STOL runway. This would occur in the Jeffries Point area of East Boston if planes were to take off in a westerly direction, and if the STOL runway were used by turbojets taking off in either direction. Massport does not dispute these facts but relies on a Memorandum of Understanding agreed to by Massport and by the Secretary of EOTC. Under this memorandum the present threshold landing points would be retained despite the extensions of the runways. With respect to the STOL runway, the memorandum agrees that the runway will not be used by turbojets and that there will be no takeoffs to the west. These restrictions can be changed under the memorandum

---

[7] Other courts have similarly regarded the views of expert agencies on particular matters before the court. *Warm Springs Dam Task Force* v. *Gribble,* 417 U. S. 1301 (1974) (Douglas, J., as Circuit Justice), defendant's motion to vacate denied, 418 U.S. 910 (1974). *Trafficante* v. *Metropolitan Life Ins. Co.* 409 U. S. 205, 210 (1972). *Sierra Club* v. *Froehlke,* 359 F. Supp. 1289, 1349 (S. D. Tex. 1973), revd. on other grounds sub nom. *Sierra Club* v. *Callaway,* 499 F. 2d 982 (5th Cir. 1974).

but, if they are, State and Federal environmental impact statements are to be filed.

The judge discounted the protection afforded by this memorandum, stating that it cannot serve as a substitute for the procedural requirements of MEPA. He concluded, "An impact report is offered, too late, after the concrete has hardened and the runways are in operation." The purpose of § 62 is to require that impact reports be prepared before an irreversible commitment to a project is made. Where the potential environmental damage involves the use of a project rather than its actual construction, there is of course no damage at all if the project is simply built and not used. But § 62 prescribes that the impact report must be prepared prior to construction, that being the proper time for the consideration of environmental factors. See EOTC Reg. 1.4. Were we to adopt Massport's argument on this point, an agency could postpone such considerations until construction was completed. That is not the contemplation of the statute. Again the basic question is whether the project *may* cause damage not insignificant to the environment. Assuming that Massport has no intention of employing the project in a harmful way, it is undeniable that the potential is there. Thus, in defining "significant," the regulation states: "Extremely improbable events may ... be significant if the magnitude of the possible effect is sufficiently important." EOTC Reg. 2.9. The judge stated that he considered the evidence in the context of "whether there is a use of the runway extensions and new runway area which may cause damage to the environment." The judge applied the correct legal standard here and the application to the facts is not diminished by the Memorandum of Understanding.

The only case cited by Massport to support its contention is *Sierra Club* v. *Mason,* 365 F. Supp. 47 (D. Conn. 1973). In that case the court did accept the defendant's assurances that a project would be carried out in a particular way so as to minimize environmental damage. However, these assurances were made as part of an EIR, the preparation of which had been ordered by the court, not (as Massport

requests in this case) to avoid preparation of an EIR altogether. It follows that in this case the memorandum should be part of an EIR and could constitute important evidence that Massport had met its obligation under § 61 to minimize damage to the environment. It should not be employed, however, as a means of avoidance of completion of an EIR prior to commencing runway construction.

3. *Other Evidence of Noise Impact.* Even were the Memorandum of Understanding viewed as minimizing the noise impact from changing the landing thresholds on runways 4L and 9, and using the STOL runway for turbojets, other evidence exists of noise impact sufficient to indicate that the judge's views on this matter were not "clearly erroneous." We do not document nor detail this evidence but it exists and was available for the judge's consideration. While the evidence, consisting of projections of various types of air traffic using the new runways and the effect on inhabited areas adjacent to the airport, is not necessarily conclusive, there is enough evidence of potential impact to establish a genuinely disputed issue, and we cannot fault the judge on his view of it. Under Mass. R.Civ.P. 52 (a), 365 Mass. 816 (1974), disputed questions of fact must be viewed in the light most favorable to the appellees. See, e.g., *United States* v. *Disney,* 413 F. 2d 783, 787, n. 2 (9th Cir. 1969). Moreover, the very existence of controversial and disputed factual claims of environmental effect underscores the necessity for an EIR. *No Oil, Inc.* v. *Los Angeles,* 13 Cal. 3d 68, 85-86 (1974). Council on Environmental Quality, 40 C. F. R. § 1500.6 (a).

Massport argues that the judge's findings are too vague and general to comply with Mass. R.Civ.P. 52 (a) which is said to require findings sufficiently detailed to permit intelligent review by this court. Massport asks for a remand for further findings. As we see it, however, in light of the low threshold of environmental damage required for an EIR, the judge's finding that some residential areas might suffer from significant noise exposure is sufficient. We see no necessity of requiring him to make specific findings of the precise increases in decibel levels in specific

locations. That burden properly belongs to Massport to be discharged in the preparation of a detailed impact report.


### III.    SECTION 61 DETERMINATION.

As to the Massport argument that it has complied with § 61, the judge declined to rule, observing that such determination could be made only after the filing of the EIR pursuant to § 62. This conclusion is plainly correct. Assuming the requirement of an EIR, it must be published sixty days before the commencement of the project under § 62. It serves as a disclosure device for other branches of government and the public. The device may well produce suggestions affecting the ultimate determination of Massport on how and whether to build the project. Furthermore, the EIR serves as an agency record for court review of any challenge to the § 61 determination: "[I]t is the environmental impact report required by § 62 which is to provide the data on which § 61 decisions are to be based and against which such decisions may be evaluated." *Boston* v. *Massachusetts Port Authy.* 364 Mass. 639, 660 (1974). Thus the § 61 determination must await preparation of a final EIR.

The judgments of the Superior Court judge are affirmed.

*So ordered.*