SANDRA MARLOW & others *vs.* CITY OF NEW BEDFORD & others.

Bristol. September 17, 1975. — January 9, 1976.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*New Bedford. Environmental Affairs. Jurisdiction, Civil,* Damage to the environment.

Where, prior to the effective date of certain provisions of the Massachusetts Environmental Policy Act, G. L. c. 30, § 62, the city of New Bedford had secured a commitment of funds from the Commonwealth for work on a project to widen and straighten a street and to construct a storm drain system beneath the street, which was a precondition to Federal funding for a new sewage treatment facility to New Bedford, and where it could be inferred that the city had made a commitment to Federal authorities to create the drain system, a finding that construction had commenced prior to

such effective date was not clearly erroneous or inconsistent with relevant legal standards; the city was not required to prepare an environmental impact report in compliance with c. 30, § 62. [503-511]

BILL IN EQUITY filed in the Superior Court on March 5, 1974.

The suit was heard by *Donahue,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Martin A. Lipman* for the plaintiffs.

*Richard J. Moore,* Assistant City Solicitor (*Francis V. Matera* with him) for the city of New Bedford.

*Leo S. McNamara,* Assistant Attorney General, for the Department of Public Works.

TAURO, C.J.   The plaintiffs, residents of New Bedford, brought this suit pursuant to G. L. c. 214, § 10A,[1] to enjoin continuation of work on a project to widen County Street in New Bedford (the Project).   In their complaint, as amended, the plaintiffs alleged that the defendants[2] had failed to comply with certain provisions of the Massachusetts Environmental Policy Act (MEPA), G. L. c. 30, § 62 (inserted by St. 1972, c. 781, § 2), and regulations of the Executive Office of Transportation and Construction (EOTC) which require that certain instrumentalities of the Commonwealth file an environmental impact report (EIR) prior to commencement of projects which may cause damage to the environment.   The central issues are whether, in fact, the Project had commenced prior to the effective date of the statute and whether the environmental impact was "insignificant."   After a trial on the merits, the trial judge filed findings of fact and rulings of

---

[1] Pursuant to St. 1973, c. 1114, § 62, the substance of G. L. c. 214, § 10A, is now in G. L. c. 214, § 7A.

[2] In the complaint, the city of New Bedford, the New Bedford Redevelopment Authority, the Massachusetts Department of Public Works, Bristol County, and A. R. Belli, Inc., were named as defendants.

law resolving both issues in favor of the defendants and ordered entry of judgment for the defendants. The plaintiffs appealed. The case is before us on allowance of the plaintiffs' application for direct appellate review. We affirm.

1. *The factual context.* We summarize the relevant facts, drawn from the judge's findings, the stipulation of parties, and other aspects of the record.

County Street is a major north-south traffic artery for the city of New Bedford. Its sidewalks are wide, and its roadway for vehicular traffic is relatively narrow. Thirty-one shade trees, primarily maple and elm, line the street.[3] According to testimony given at trial, the buildings on County Street and the uses to which they are put are varied. There is one section which is the location for many fine old mansions with grounds, preserved as they were in the Nineteenth Century, and owned for the most part by public and charitable institutions and professional people. A part of this area falls within the West End Terminal Area of the New Bedford Redevelopment Authority (NBRA). Although the New Bedford Historical Commission, established pursuant to G. L. c. 40C, has never officially designated any portion of County Street an "historic district," the judge found on ample evidence that "much of County Street," presumably referring to the area of mansions and grounds to which testimony regarding historical significance was directed at trial, is "of historical significance."[4]

The Project will straighten and widen the roadway of County Street, narrow the sidewalks, and remove the shade trees. Although witnesses testified that the roadway construction would improve traffic safety, diminish

[3] According to the stipulation, some of the trees have already been cut down.

[4] There was also testimony from a landscape architect as to the aesthetic significance of the trees and the current layout of the street.

congestion, and alleviate pollution from automobiles traversing County Street, New Bedford's principal concern in undertaking the roadway portion of the Project seems to have been to obtain funding for a storm drain system beneath County Street. At present, storm water and sewage flow through the same pipes beneath County Street. The storm drain system will separate storm water from sewage and alleviate a flooding problem. Construction of the storm drain system was a condition to the Federal funding for the New Bedford sewage disposal facility. However, New Bedford was unwilling to finance fully the construction of the storm drain system on its own and wanted the Commonwealth to absorb part of the cost of the system. The Commonwealth would not contribute funds to a storm drain project alone and would finance construction of storm drains only in connection with construction or reconstruction of County Street. To obtain funding, New Bedford accepted the so called "Chapter 90" project, G. L. c. 90, § 34, under the auspices of the Massachusetts Department of Public Works (DPW).[5]

---

[5] For ease of reference, we set forth the significant events forming the background of the case in the form of a chronology:

1. *September 23, 1969.* By this date, New Bedford had requested and received a commitment of funds from the Commonwealth for construction on County Street. Presumably, although the record is not helpful on this point, some Federal commitment regarding the sewage disposal plant conditioned on construction of storm drains had been obtained prior to, or was obtained shortly after, this date.

2. *December 10, 1971.* New Bedford contracted with Tibbetts Engineering Corp. for engineering services related to the design and layout of the Project.

3. *March 8, 1973, and April 12, 1973.* The New Bedford city council held an open hearing on widening of intersections which necessitated a taking of land.

4. *May 15, 1973.* DPW filed an environmental assessment of the Project.

5. *June 18, 1973.* Completed engineering plans were forwarded to New Bedford and DPW. Work on the plans by Tibbetts Engineering Corp. cost $77,151.30. The cost of the total Project, as planned, will be in excess of $838,147.

2. *Statutory provisions and regulations.*[6]   MEPA con-
sists of two complementary sections.   General Laws c. 30,
§ 61, establishes an official policy of environmental pro-
tection in the Commonwealth and requires that various
enumerated categories of State instrumentalities use "all
practicable means and measures to minimize damage to
the environment."   General Laws c. 30, § 62, prescribes
a procedure for thorough consideration of potential en-
vironmental impact through preparation of a draft and a
final EIR and through submissions of these EIR's to in-
terested State agencies and the public.   Specifically,
G. L. c. 30, § 62, provides that "[n]o agency, depart-
ment, board, commission, or authority of the common-
wealth or any authority of any political subdivision there-
of shall commence any work, project, or activity which
may cause damage to the environment until sixty days
after it has published a final environmental impact report
. . . or until sixty days after a public hearing on said
report . . . ." The final EIR supplies the data for the re-
quired § 61 determination that the project, as planned,
minimizes damage to the environment and for evaluation
of the determination by a reviewing court.   *Secretary of
Environmental Affairs* v. *Massachusetts Port Authority*,
366 Mass. 755, 761 (1975).   *Boston* v. *Massachusetts Port
Authority*, 364 Mass. 639, 660 (1974).   However, because

---

6. *July 1, 1973.*   General Laws c. 30, § 62, become effective.   The
judge found that the Project had commenced prior to July 1.

7. *July 16, 1973.*   Highway engineer for the Commonwealth noti-
fied the New Bedford commissioner of public works by letter that he
had received and approved the plans for the Project.

8. *October 20, 1973.*   New Bedford invited bids on the Project.

9. *November 13, 1973.*   New Bedford executed a contract with the
defendant A. R. Belli, Inc., to do the County Street work.

10. *March 5, 1974.*   A. R. Belli, Inc., began work on the Project
by cutting down some of the trees on County Street.

[6] For a fuller discussion of the statutory scheme and applicable
regulations, see *Secretary of Environmental Affairs* v. *Massachusetts
Port Authority*, 366 Mass. 755, 760-762 (1975).

the effective dates of §§ 61 and 62 are staggered,[7] § 62 may not be applicable to some projects governed by § 61. If a project commenced prior to July 1, 1973, § 62 is inapplicable and no EIR is required. *Secretary of Environmental Affairs* v. *Massachusetts Port Authority, supra* at 762. Similarly, § 62 is inapplicable and no EIR is required where damage to the environment which may be expected to result from a particular project is "insignificant." G. L. c. 30, § 61.

In furtherance of the statutory scheme, G. L. c. 30, § 62, directs that "the secretaries of the executive offices shall each promulgate rules and regulations approved by the secretary of environmental affairs to carry out the purposes of this section . . . and which shall conform with the requirements of the National Environmental Policy Act Pub. Law 91-190, and amendments thereto." Pursuant to that authority, the secretary of the Executive Office of Environmental Affairs (EOEA) published regulations, but these do "not apply to projects which have commenced before July 1, 1973."[8]  EOEA Reg. 13 sets general guidelines for deciding when a project "shall be deemed to have commenced," and also provides that the secretaries of the executive offices shall, with the approval of the secretary of EOEA, "further define the word 'commenced' . . . by . . . regulations" which "shall specifically identify a uniform phase or point, the completion or attainment of which commits the agency to the ultimate completion of a specifically planned activity."  The secretary of EOTC has promulgated regulations which govern the DPW and which enumerate criteria for use in determining whether a given activity has "commenced."[9]

---

[7] Section 61 became effective on December 31, 1972, but § 62 did not become effective until July 1, 1973.  St. 1972, c. 781, § 3.

[8] Regulations to Create a Uniform System for the Preparation of Environmental Impact Reports (EOEA Regs.), Reg. 13.

[9] "Regulations Pursuant to Chapter 30, Section 62 of the Massachusetts General Laws for the Preparation of Environmental Impact Reports . . . ." (EOTC Regs.) § 13.3.

3. *Findings and rulings of the trial judge; contentions of the plaintiffs.* There were two distinct, alternative grounds for the trial judge's order for entry of judgment for the defendants and implicit ruling that no EIR was required for the Project: (1) The judge ruled that, "in view of the environmental advantage," i.e., improved sewage treatment, to be derived from the Project, any environmental harm from the Project "must be deemed 'insignificant.'" (2) After a review of the relevant part of the Project's chronology, the judge concluded that "[a]ll that remained to be accomplished after July 1, 1973, was to put the plans and specifications out for bid by private contractors." Therefore, the judge ruled that the Project had "commenced" prior to July 1, 1973.

The plaintiffs challenge both grounds for the judgment below. They contend that the cutting of shade trees which beautify and cool County Street and the widening and straightening of County Street's roadway so as to produce a higher speed traffic artery threaten significant environmental harm which must be considered in an EIR. They argue that the Legislature intended that balancing of environmental harm against environmental advantage should occur in the EIR and that such balancing by a trial judge, reviewing an administrative determination that no EIR is required because impending environmental harm is insignificant, subverts the statutory procedure to have such balancing performed in the context of inter-agency review. Further, the plaintiffs maintain that the Project had not commenced on July 1, 1973, and that an EIR would still have been "practicable" on that date. They emphasize that, as of July 1, 1973, the contract with A. R. Belli, Inc., for construction had not been signed and actual construction had not begun.

To succeed in this appeal, the plaintiffs must prevail on both phases of their argument. Because we hold that the trial judge properly found and ruled that the Project had commenced before July 1, 1973, we do not reach the

plaintiffs' arguments respecting the significance of the environmental harm threatened.

4. *Commencement of the project.* Our review of the findings, rulings and judgment of the trial judge, entered August 15, 1974, is governed by the new Massachusetts Rules of Civil Procedure. Mass. R. Civ. P. 1A, 365 Mass. 731 (1974). In nonjury cases, such as the instant one, the rules provide that "[f]indings of fact shall not be set aside unless clearly erroneous." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). In addition, this court must examine the legal standard applied to the facts found in order to assure that the ultimate findings and conclusions below were consistent with statutory norms. See *Secretary of Environmental Affairs* v. *Massachusetts Port Authority*, 366 Mass. 755, 768-770, 773 (1975).

The plaintiffs do not challenge the judge's findings of subsidiary facts.[10] Rather, they challenge the ultimate finding, based on these findings of subsidiary facts and the applicable law, that the Project had commenced before July 1, 1973. We cannot say that this ultimate finding is either clearly erroneous or inconsistent with the relevant legal standards.

Pursuant to EOEA Reg. 13, construction may be "deemed to have commenced when the agency . . . has entered into a binding agreement or other obligation to undertake and complete a continuous program of action

---

[10] By implication, they challenge his ruling that "[a]ll that remained to be accomplished after July 1, 1973, was to put the plans and specifications out for bid by private contractors." In their brief, the plaintiffs emphasize that the plans for the Project were not approved by the DPW until after July 1, 1973. As will be noted in the text below, we accord no great significance to this later approval.

or construction."[11]    Interpreting this standard, we have said that "what is necessary . . . is the existence of a commitment entered into prior to July 1, 1973, which is irreversible in nature, and which has a clearly defined objective." *Secretary of Environmental Affairs* v. *Massachusetts Port Authority*, 366 Mass. 755, 763 (1975).    As early as September 23, 1969, New Bedford secured a commitment of funds from the Commonwealth for the Project.  As noted, the commitment was for the redesign and reconstruction of County Street's roadway, which was to occur simultaneously with the installation of the separate storm drain system, and, in turn, was a precondition to Federal funding for a new sewage treatment facility in New Bedford, and the judge could infer from the evidence that a commitment to create the separate system had been made to Federal authorities at or near the time of the Commonwealth's commitment to New Bedford. Thus, there existed a matrix of commitments among New Bedford, the Commonwealth, and the Federal government in which the commitments to act and fund were interdependent.    Abandonment of the street widening work would have cost New Bedford its funding from the Commonwealth and would have jeopardized the storm drain aspect of the Project.  If New Bedford had been unable to secure funding for the storm drains without the Commonwealth's assistance, it would have been compelled to renege on its agreement with the Federal government — with all that that would imply.  In these circumstances, we believe that the commitment to the "clearly defined" Project which included the widening and straightening of the roadway was "irreversible" within the meaning of the EOEA Regulations long prior to July 1,

---

[11] For consideration of the phrase "has undertaken a continuous program of action or construction," which we have omitted from the quotation above, see *Secretary of Environmental Affairs* v. *Massachusetts Port Authority*, 366 Mass. 755, 763 (1975).

1973.[12]   We reject the suggestion that such a commitment must be one between a public agency and a construction contractor for actual construction work on a project and that the only committing contract here was executed on November 13, 1973, with A. R. Belli, Inc.

The EOTC regulations, relied on by both the plaintiffs and the defendants, cumulatively support the decision below.  As of July 1, 1973, New Bedford had obtained a commitment of funds for the Project, had awarded an engineering contract, and had received the final engineering plans for the Project.  The DPW had completed and filed an environmental assessment pursuant to G. L. c. 30, § 61, prior to that date.  EOTC Reg. 13.3(1).  No major decisions respecting the Project remained to be made; all had been made in the finding and engineering design phases.  EOTC Reg. 13.3(3).  There was evidence at trial that DPW scrutiny of the engineering plans and subsequent approval were designed *only* to assure that the plans were complete.  As of July 1, 1973, over nine per cent ($77,151.30) of the total estimated cost of the Project ($838,147) had already been expended on the engineering plans and design.  EOTC Reg. 13.3(2).

This is not a case such as *Secretary of Environmental Affairs* v. *Massachusetts Port Authority*, 366 Mass. 755 (1975), in which it could not be said that the Massachusetts Port Authority was bound to "the ultimate completion of a specifically planned" (EOEA Reg. 13; *Secretary of Environmental Affairs* v. *Massachusetts Port Authority, supra* at 763) runway extension project prior to July 1, 1973.  In the *Massachusetts Port Authority* case, a contract of "'[p]reparation . . . of *preliminary* designs and drawings'" (emphasis supplied) was not executed

---

[12] The hearings as to the takings of land for the widening of intersections in the Project area held in 1973 affected private land already used for sidewalks by New Bedford and, in any event, would have been unlikely to alter any major Project decision.  Compare the hearings in *Secretary of Environmental Affairs* v. *Massachusetts Port Authority*, 366 Mass. 755 (1975), *infra*.

until July 26, 1973. (*Id.* at 766.) Although some construction work had been performed in the Project area, an official public notice of the Massachusetts Port Authority, dated after that work had been completed, expressly disclaimed any final approval of proposed airport improvements and requested testimony from the public for use in the decision-making process. *Id.* at 765. By contrast, in the instant case, the *final* drawings and specifications were completed at substantial cost and submitted by the engineers prior to July 1, 1973, and the decision to widen and straighten the roadway long antedated the effective dates of MEPA and G. L. c. 30, § 62.

The plaintiffs' reliance on Federal cases and Guidelines of the Council on Environmental Quality decided under the National Environmental Policy Act (NEPA), Pub. L. No. 91-190, 42 U.S.C. § 4321 (1970) et seq., is misplaced. Unlike G. L. c. 30, § 62, the provisions of NEPA relative to preparation of environmental impact statements, 42 U.S.C. § 4332(c) (1970), contain no reference to or focus on the time a project commences. The Federal courts which decided the cases relied on here have interpreted NEPA to require an environmental statement even for projects which were *ongoing* at the time NEPA became effective provided certain standards of feasibility were met. See *Jones* v. *Lynn*, 477 F.2d 885, 889-891 (1st Cir. 1973); *Environmental Defense Fund* v. *Tennessee Valley Authority*, 468 F.2d 1164, 1176-1178 (6th Cir. 1972); *Arlington Coalition on Transp.* v. *Volpe*, 458 F.2d 1323, 1330-1332 (4th Cir.), cert. den. sub nom. *Fugate* v. *Arlington Coalition on Transp.*, 409 U.S. 1000 (1972).

*Judgment affirmed.*