RICHARD L. LUNDGREN vs. BERYL GRAY.

No. 95-P-491.

Worcester. June 6, 1996. - October 9, 1996.

Present: WARNER, C.J., ARMSTRONG, & KASS, JJ.

*Practice, Civil,* Findings by judge. *Probate Court,* Findings by judge, Jurisdiction, Divorce. *Divorce and Separation,* Jurisdiction, Division of property. *Contract,* Specific performance.

In an action for contempt arising from a dispute between parties in a divorce proceeding over payment of costs associated with the maintenance of certain property held in trust, a probate judge's findings of fact were not clearly erroneous, where they were supported on any reasonable view of the evidence, including all rational inferences of which it was susceptible. [456-457]

In an action for contempt arising from a dispute between parties to a divorce proceeding regarding certain property held in trust for their benefit, the judge, acting pursuant to the Probate Court's plenary equity jurisdiction in controversies over property between divorced persons, properly denied the husband's request for the wife's contribution to costs associated with maintaining the property, where there was ample evidence that the husband had been guilty of unfair conduct and had taken inequitable advantage of the wife during the period in question. [457-458]

COMPLAINT for divorce filed in the Worcester Division of the Probate and Family Court Department on October 13, 1987.

A complaint for contempt, filed on March 12, 1993, was heard by *John J. Moynihan, J.*

*Kenneth R. Kohlberg* for the plaintiff.

*Charles E. Wood* for the defendant.

WARNER, C.J. The relevant facts, drawn from the judge's findings and the uncontroverted evidence in the record, are as follows. The plaintiff, Richard L. Lundgren, was married to the defendant, Beryl Gray, on April 7, 1956. On June 12, 1981, the parties established the Lundgren Family Trust (trust), conveying by deed to the trustees their interest in

eight separate parcels of commercial real estate at the corner of Main and Herman Streets in Worcester (property). A business known as Lundgren Honda, of which Lundgren was the principal, operated on the property. The trust was set to expire on July 12, 1991, with the property to revert back to Lundgren and Gray at that time.

On April 20, 1988, the parties were divorced by a judgment nisi; the trust property was not a subject of the judgment. However, on June 19, 1990, a modification judgment (modification) was entered into; it incorporated an agreement executed by the parties regarding the property. This agreement included the following provisions: (1) that the property would be placed for sale if Lundgren's business, Lundgren Honda, either moved or was sold; (2) that Lundgren and Gray were to share equally in any annual income from the property, with Gray to receive a minimum of $30,000 annually; (3) that if the normal income from the property did not provide Gray with $30,000, the parties would renegotiate the terms of a lease on the property so that the $30,000 was realized; and (4) that the parties were promptly to renegotiate a five-year lease on the property, with an option allowing the lease to terminate upon the sale or relocation of Lundgren Honda.

The trust expired on July 12, 1991, at which time the property was conveyed back to Lundgren and Gray by deed dated August 5, 1991. On January 6, 1992, Gray filed a complaint for contempt[1] which was resolved through a written stipulation (stipulation) on February 10, 1992, requiring the parties to sign a lease for the property. This required lease recites it was executed "by and amongst" Lundgren, Gray and Lundgren Honda, Inc., on February 10, 1992. Lundgren and Gray are identified as the landlords, and Richard L. Lundgren, Inc., as the tenant (tenant). The lease was for a term of five years, at an annual rental of $60,000, or $5,000 per month.

More particularly, the lease detailed the different options available to the parties in disposing of the property should

---

[1] In Lundgren's complaint for contempt, which is the subject of this action, he sought specific enforcement of the lease which was incorporated into and made a part of the 1992 judgment of contempt.

the tenant vacate the premises.[2] Paragraph 8.1.1 gave each party the option to purchase the property upon the termination of the lease. In addition, paragraph 8.1.2 provided that if one of the parties exercised the option to purchase, then six months from the purchase date, title to the property would be conveyed "by a good and sufficient quitclaim deed conveying a good and clear marketable title free from all encumbrances."

Paragraph 8.1.3 of the lease provided that: "From the time this Lease terminates to the time title to the Premises *vests fully in [Lundgren, Gray] or some third party*, all costs associated with maintaining the Premises including, but not limited to, mortgages, insurance, real estate taxes, utilities and general maintenance, shall be equally divided and one-half of the expenses shall be paid for by each of the Landlords" (emphasis added). The paragraph also outlined the protocol when one landlord pays for the noncontributing landlord's share in relevant expenses, allowing the paying landlord to be reimbursed at the time of sale or the lease of the property.

Finally, paragraph 8.2.2 provided an additional option available to the parties if the tenant should vacate the property; *"notwithstanding any of the foregoing"* (emphasis added), the property would be sold at a public auction within 120 days of the tenant's departure, or at a later time by agreement of the parties.[3]

The tenant terminated the lease on March 22, 1992. Neither Lundgren nor Gray exercised the option to purchase, and a broker was unable to sell the property. In a final effort to dispose of the property, both parties agreed to sell it at a public auction.

On the day of the auction, October 16, 1992, there were no third-party buyers present. Lundgren, on behalf of another corporation of which he was principal, Lundgren Auto Group, Inc.,[4] decided to buy the property for $1,000. In connection with the sale, the parties signed a document entitled

---

[2]Under paragraph 8.2, the tenant had the right to terminate the lease at any time, provided that it vacate the property upon its exercise of the right.

[3]The typed lease states the public sale was to take place 120 days after the tenant vacated the premises; however, the judge found that the parties intended the number to be 150 days. In any event, the auction took place on a mutually agreed upon date, October 16, 1992.

[4]Lundgren Auto Group, Inc., subsequently changed its name to AP Properties, Inc.

"Auctioneer's Agreement" and "Memorandum of Terms and Conditions of Sale" with appended "Exhibit 'A'/Additional Terms" (auction documents). Included in the auction documents was the following language:

> "The premises are to be conveyed to the Purchaser not more than Thirty (30) days after approval of the sale, by a good and sufficient Deed, *subject to all outstanding tax title municipal taxes, charges, assessments and liens . . . and subject to existing tenancies, if any, and encumbrances of record. . . .*
>
> "` `. . .
>
> "*[T]he successful bidder shall take the property subject to all taxes, charges, assessments and liens now existing or hereafter arising* and those having priority over the mortgage, excluding charges from New England Telephone . . . Commonwealth Gas and Massachusetts Electric" (emphasis added).

The auction documents further provided that "[n]othing contained in th[e] agreement shall be construed as a waiver by Richard Lundgren to seek recovery against Beryl Gray for such payments [i.e. notes, mortgages and utilities] as may be established." In addition, the auction documents allowed the buyer to rescind his offer and collect his deposit if the premises could not be delivered in accordance with the lease language.

Contrary to the auction documents, title to the property was not conveyed by good and sufficient deed within thirty days. Still, Lundgren did not rescind the sale as was his right under the auction documents. Instead, he assumed the mortgages and expenses and began contending with the numerous title problems, with which he was well acquainted prior to purchasing the property at the auction.

After the auction, the Worcester County Abstract Company examined the title to the property and issued a nine-page title report (report) which was delivered to Lundgren's attorney on January 7, 1993. The report listed numerous problems with the title that needed to be rectified in order to convey the "good and sufficient deed" required under the auction documents.

Among the litany of problems, the report identified several mortgages that had to be paid off, several affidavits that were required regarding probate cases, affidavits that were required of trustees from the trust that held the premises until August 5, 1991, a reversionary interest of Shawmut Worcester County Bank that had to be renegotiated, lease issues that had to be resolved, an assumption agreement that had to be worked out with Safety Fund National Bank, and other affidavits and documents that were required.

Lundgren directed the necessary title work from the auction date to the time of its completion, while Gray cooperated with him with respect to the title work from her new residence in Georgia.

The property was ultimately transferred to AP Properties, Inc., another corporation of which Lundgren was principal,[5] on June 21, 1993. Gray had not made any payments to Lundgren for any expenses relating to the property since the termination of the tenant's lease on March 22, 1992. The evidence was inconclusive as to the specific bills and amounts that had been paid.

Lundgren claims he is entitled to $65,646.43 from Gray, her share of the expenses from March 22, 1992, the lease termination date, to June 21, 1993, the final deed conveyance date. Gray concedes some nonpayment, but argues that she is only responsible for monies spent on maintenance between March 22, 1992, and October 16, 1992, the auction date. Both parties agree that seventeen percent is the appropriate amount of interest to apply to whatever Gray owes Lundgren.

After the presentation of evidence, the judge found that equitable principles dictated that Gray's responsibility ended on October 16, 1992, the date of the auction. The judge relied on the following compelling factors: (1) when both parties entered into the stipulation and the lease, with its paragraph 8.1.3 "fully vests" language, they anticipated a third party arm's length transaction for full and adequate consideration; (2) Lundgren did not intend to buy the property at the auction, but did so after no third party bid on the property; (3)

---

[5]AP Properties, Inc., was the successor of Lundgren Auto Group, Inc. See note 4, *supra.*

from the auction date and all times thereafter, Lundgren was in total control of the transaction (e.g., he decided not to re-scind the sale and thereby incurred the expense of the title work) and essentially was landlord and tenant and then buyer and seller; and (4) the extent to which Lundgren exercised control and created Byzantine complexity is illustrated by the number of legal entities used by Lundgren in this transaction, in all of which he was the principal.[6]

The judge also found inequity because any expenditures ac-crued between the auction date and the deed recording date for mortgage payments, utilities, title work, or anything else in connection with the property, inured entirely to Lundgren's benefit. Thus, requiring Gray to reimburse Lundgren would unjustly enrich him. Moreover, the judge thought it unfair to permit personal reimbursement where it was unclear from the evidence whether any of Lundgren's corporations made the payments for which Lundgren seeks contribution; indeed, if made by a corporation, it would be inappropriate to permit such reimbursement for Lundgren individually.

Lundgren now appeals from the Probate Court judgment that found Gray in contempt for wilfully failing to obey court orders[7] to reimburse Lundgren for one-half of the real estate expenses connected to maintaining the property. Lundgren appeals from that portion of the judgment requiring Gray to contribute toward these expenses only for the period between March 22, 1992, and October 16, 1992. Lundgren specifically contends that Gray's obligation extended, as a matter of law, from March 22, 1992, through June 21, 1993. We affirm the judgment as entered by the Probate Court judge.

*Findings of fact.* On appeal, Lundgren claims to challenge the probate judge's findings of fact. We do not set aside a

---

[6]The property was originally in the trust. Located on the property was an automobile dealership, Lundgren Honda, of which Lundgren was a principal. The lease executed in February, 1992, was entered into by Lund-gren Honda but named Richard A. Lungren, Inc., as the tenant, with Lund-gren and Gray as the landlords. Still later, after Lundgren Honda vacated the premises, the auction sale documents were executed by Lundgren, individually, and for the Lundgren Auto Group, Inc., as the buyer. The conveyance was ultimately made to a fourth Lundgren corporation, AP Properties, Inc.

[7]"Orders" refers to the modification judgment entered on June 19, 1990, incorporating the modification agreement of the same date, and the judg-ment of February 10, 1992, incorporating the written stipulation.

judge's findings of fact unless they are "clearly erroneous." Mass.R.Dom.Rel.P. 52. A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). In applying this standard, the reviewing court must give deference to the trier of fact who, by virtue of his firsthand view of the evidence, was in a better position to judge the weight and credibility of the evidence. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

Here, where Lundgren simply brings to our attention conflicting facts, he is essentially asking us to weigh anew the evidence supporting his position.[8] See *First Penn. Mort. Trust,* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621-622, 623-624 (1985). Even if there was conflicting evidence, the probate judge's findings were supported "on any reasonable view of the evidence, including all rational inferences of which it was susceptible." *T. L. Edwards, Inc.* v. *Fields*, 371 Mass. 895, 896 (1976), quoting from *Bowers* v. *Hathaway*, 337 Mass. 88, 89 (1958). There was no error.

*Conclusions of law.* Lundgren also argues that the judge erred in his conclusions of law. He contends that the plain language of paragraph 8.1.3 of the lease requires Gray to share in expenses for the period between March 22, 1993, when the tenant vacated the property, to June 21, 1993, when the final deed was recorded and the property "vest[ed] fully" with AP Properties, Inc. Lundgren, in short, argues that the probate judge should have granted specific performance on Lundgren's interpretation of the lease. The probate judge,

---

[8]For instance, Lundgren argues with the probate judge's finding that Lundgren was in "total" control of the title work: the Worcester County Abstract Company did not release its report until January 7, 1993, causing Lundgren some delay in beginning to contend with the problems. However, this information was before the probate judge when he made his final determination, and clearly did not carry much weight against the other evidence showing that: (1) Lundgren still took six months after the report was issued to complete the title work; (2) many of the problems were known to Lundgren before his corporation bought the property and could have been rectified years before the purchase; and (3) Lundgren could have rescinded his offer under the auction documents, and avoided the title work altogether.

however, refused Lundgren's request, and instead limited Gray's liabilities to the period between March 22, 1992, the termination of the lease date, and October 16, 1992, the auction date.

It is well established that the Probate Court has plenary equity jurisdiction in controversies over property between divorced persons. G. L. c. 215, § 6. *Wood* v. *Wood*, 369 Mass. 665, 668-671 (1976). As such, we conclude that the probate judge acted properly in denying Lundgren's request for specific performance. After hearing ample evidence that Lundgren had taken advantage of Gray through his knack for controlling events, and his inaction and delay regarding the title problems, the judge correctly reasoned that specific performance may be refused to one, like Lundgren, who himself has been guilty of unfair conduct or has taken inequitable advantage of another. Indeed, a plaintiff seeking specific performance must himself be free from blame. See *Shikes* v. *Gabelnick*, 273 Mass. 201, 206 (1930).

*Conclusion.* We hold that the evidence amply supported the findings of fact of the probate judge and provided a rational basis for his application of equitable principles.

The judgment is affirmed, and the case is remanded to the Probate Court for further findings as to the specific bills and amounts paid.

*So ordered.*